73 P.3d 947 (2003)
2003 UT App 28
ASPENWOOD, L.L.C.; JMS Hidden, L.L.C.; and JMS Financial, L.L.C., Plaintiffs and Appellants,
v.
C.A.T., L.L.C.; Paul Taggart; and John Coats, Defendants and Appellees.
No. 20010735-CA.
Court of Appeals of Utah.
February 6, 2003.
Rehearing Denied August 6, 2003.
*949 Brian W. Steffensen, David C. Condie, and Damien E. Davenport, Steffensen Law Office, Salt Lake City, for Appellants.
Stephen B. Mitchell and Richard D. Burbidge, Burbidge & Mitchell, Salt Lake City, for Appellees.
Before Judges JACKSON, GREENWOOD, and ORME.

OPINION
GREENWOOD, Judge:
¶ 1 Plaintiffs Aspenwood, L.L.C. (Aspenwood), JMS Hidden, L.L.C., and JMS Financial, L.L.C. (together referred to as JMS) appeal various orders and judgments entered against them and in favor of Defendants C.A.T., L.L.C. (CAT), Paul Taggart (Taggart), and John Coats (Coats). We affirm.

BACKGROUND[1]
¶ 2 Dan Mehr (Mehr) owned an excavation company called Baucorp, Inc. (Baucorp). Baucorp entered into a contract with Newport Holdings, Inc. (Newport), owned by Kent Hogan (Hogan), to acquire Newport's interest in various real estate development projects (the Newport Contract). The Newport Contract gave Baucorp an option to purchase and assume Newport's position in various contracts for real estate development projects described in an addendum. The addendum did not include legal descriptions or addresses of the properties, but only generalized reference to projects, usually by name of city. The Newport Contract did not specify a closing date, but indicated closings would occur "as developed."
¶ 3 Mehr approached Coats and Taggart about their possible financial participation in the Newport enterprise. Coats and Taggart operated through their company, CAT. According to Mehr, Hogan had represented that he anticipated imminent subdivision approval for one of the proposed projects, Hidden Ridge, and that Ryland Homes had contracted to purchase 100 of the Hidden Ridge lots. As a result, Hidden Ridge would produce substantial cash flow by fall 1997. *950 Mehr, Taggart, and Coats formed Aspenwood for the purchase of the Hidden Ridge project and on May 22, 1997 executed an Operating Agreement. Baucorp and CAT each owned 50% of Aspenwood.
¶ 4 Contemporaneously, Aspenwood executed a purchase agreement (the Hidden Ridge Agreement) with Newport and its partner in Hidden Ridge, Lonnie Oman (Oman), to purchase their interest in the Hidden Ridge project and assume various underlying contracts. CAT funded Aspenwood's initial payment of $100,000 towards the purchase price of this project. The balance was to be paid in monthly installments with final payment due December 22, 1997. Mehr, Taggart, and Coats expected that within a couple of months, proceeds from a construction loan and lot sales would pay off their obligation under the Hidden Ridge Agreement. They also expected the funds would be sufficient to develop phase one of the Hidden Ridge project and fund other projects referred to in the Newport Contract. Aspenwood made further payments on the Hidden Ridge Contract and received title to phase one of the project.
¶ 5 Unfortunately, the Hidden Ridge project did not generate funds as the parties had hoped. Aspenwood stopped making payments on the Hidden Ridge Contract in fall 1997. Negotiations between Aspenwood and the Hidden Ridge principals were unsuccessful. By November 1998, there were unpaid bills on the Hidden Ridge project of approximately $319,000.
¶ 6 Mehr told Taggart and Coats that he knew of others who might buy out CAT's interest in Aspenwood. Subsequently, CAT sold its 50% interest in Aspenwood to JMS as documented in a written agreement (the JMS Purchase Agreement). The principals of JMS were Brian Steffensen, Harold Rosen, and Pam and Brent Watson. CAT quitclaimed its interest to JMS and was to receive the amount CAT had invested in Hidden Ridge, without any interest accrual. JMS did not pay CAT the amount agreed upon.
¶ 7 In June 1999, Aspenwood and JMS filed suit, claiming that CAT, Taggart, and Coats had defrauded JMS into purchasing CAT's interest in Aspenwood. Aspenwood claimed that the Defendants had breached their contractual duty to provide funds necessary to purchase and develop the projects that Mehr had an option to purchase from Hogan. Aspenwood also sued Hogan and his partner, Oman, for fraud. Aspenwood settled its claim against Oman and Hogan for $200,000 plus 30% of profits to be realized from further development of Hidden Ridge. CAT counterclaimed seeking payments due under the JMS Purchase Agreement.
¶ 8 The trial court set dates for discovery cutoff, motion cutoff, and trial. At the request of JMS, the court twice extended the discovery cutoff and continued the trial date. One business day before the motion cutoff date, Defendants filed a motion for partial summary judgment, seeking dismissal of all claims except the fraud claim against Taggart. JMS filed a rule 56(f) motion, seeking more time for discovery. The parties filed memoranda and supplemental memoranda setting forth their positions and the trial court conducted two hearings on the motion for partial summary judgment and subsequently granted the motion.
¶ 9 After a pretrial hearing in the trial court's chambers, the trial court sent a scheduling order and notices to the parties indicating that the trial would be to the bench. Almost a year later, shortly before the scheduled trial date, JMS indicated to the court clerk it wanted a jury trial. After a conference with the parties, the trial court determined that JMS had waived its right to a jury trial.
¶ 10 A four day bench trial was held, after which the trial court dismissed the fraud claim with prejudice. The trial court found in favor of CAT on its counterclaim for the amount due from JMS for the 50% interest in Aspenwood. Judgment was entered for CAT in the amount of $612,995 plus interest and reasonable attorney fees.
¶ 11 After JMS filed a Notice of Appeal, CAT initiated proceedings to collect its judgment. The trial court issued an Order in Supplemental Proceedings requiring that the judgment debtors appear, through Harold Rosen, for questioning about the assets of *951 the debtors. After a series of objections, motions, and hearings, Rosen's examination was scheduled to take place on July 30, 2001. CAT became aware of a $230,000 payment on July 29 from Hogan and Oman to Aspenwood, as final settlement of sums due on the Hidden Ridge project. At CAT's request, the trial court issued a preliminary injunction prohibiting Aspenwood from disposing of the funds except for payment of ordinary business expenses. Aspenwood subsequently voluntarily paid JMS's share of the payment to CAT as a credit on the judgment.

ISSUES
¶ 12 JMS devotes the first eighteen pages of its one-hundred page opening brief to a description of thirty-two issues it raises on appeal, including where the issues were preserved at trial and the standards of review applicable. However, JMS only argues five of those issues in the body of the brief. Those issues include the following: (1) Was JMS given the opportunity to conduct full and fair discovery; (2) Did the trial court properly grant CAT's motion for partial summary judgment; (3) Did JMS waive its right to a jury trial; (4) Are the findings of fact clearly erroneous; and (5) Did the trial court err in its rulings during the post trial proceedings?

ANALYSIS

I. Opportunity to Conduct Full and Fair Discovery
¶ 13 JMS argues that CAT should have been sanctioned for discovery abuses and that the trial court improperly imposed a discovery schedule. "Trial courts have broad discretion in determining discovery sanctions because trial courts must deal first hand with the parties and the discovery process." Hales v. Oldroyd, 2000 UT App 75, ¶ 15, 999 P.2d 588 (internal quotations, citation, and alteration omitted). Therefore, "appellate courts will interfere with the exercise of such discretion only when abuse of that discretion is clearly shown." Id. (internal quotations, citation, and alteration omitted).
¶ 14 A disagreement arose between JMS and CAT over the order in which certain depositions would occur. JMS claimed that CAT refused to produce party witnesses Taggart and Coats to be deposed and filed a Motion for Protective Order and Motion to Compel Production with the court. CAT responded with a Memorandum in Opposition to JMS's motions arguing that JMS was trying to prevent CAT from deposing JMS's party witnesses until the depositions JMS noticed were complete.
¶ 15 In response, the trial court met in chambers with counsel. Based on an agreement by counsel and the trial court, the court ordered depositions to be taken in a certain order. The court's order did not impose sanctions on either party. JMS claims that due to the court's order, it ran out of time to complete the depositions of several individuals, and therefore, was not able to conduct full and fair discovery. The record, however, indicates that JMS never objected to the court's order scheduling depositions. In addition, the trial court and CAT granted JMS several extensions in response to JMS's claims that it needed more time to take depositions. Given the ongoing dispute between the parties concerning the order of depositions to be taken, it was within the trial court's discretion to impose a deposition schedule and to not impose sanctions. See Oldroyd, 2000 UT App 75 at ¶ 15, 999 P.2d 588.

II. Motion for Partial Summary Judgment

A. Denial of JMS's Rule 56(f) Motion
¶ 16 JMS argues that the trial court erred in denying its rule 56(f) motion because it did not have time to complete discovery. See Utah R. Civ. P. 56(f) (stating court may order continuance of summary judgment to permit further discovery or affidavits). This court reviews the denial of a rule 56(f) motion for an abuse of discretion. See Brown v. Glover, 2000 UT 89, ¶ 29, 16 P.3d 540.
¶ 17 On October 20, 2000, CAT filed a motion for partial summary judgment requesting that the trial court dismiss JMS's causes of action regarding alter ego, breach of contract/breach of fiduciary duty, and breach of contract/fraud against Coats. JMS *952 filed a rule 56(f) motion for a continuance to permit the completion of discovery. JMS argued that without a continuance, it would be unable to fully oppose CAT's partial summary judgment motion because further depositions of Taggart and Coats, as well as the depositions of several other individuals, might lead to additional evidence of Coats's misrepresentation.[2]
¶ 18 On December 19, 2000, after reviewing the parties' memoranda and hearing arguments, the trial court denied JMS's rule 56(f) motion and granted partial summary judgment as to Coats. The trial court ordered the parties to submit supplemental memoranda regarding the remaining issues for partial summary judgment. On February 6, 2001, the trial court held a second hearing on CAT's motion for partial summary judgment, which was granted.
¶ 19 Rule 56(f) allows the opposing party to submit an affidavit stating the reasons "he is presently unable to present evidentiary affidavits essential to support his opposition to summary judgment." Downtown Athletic Club v. Horman, 740 P.2d 275, 278 (Utah Ct.App.1987). "If the court finds the reasons to be adequate [it may] ... order that further discovery be conducted and continue the summary judgment motion." Id. Rule 56(f) motions should be "liberally considered" by the trial court "unless they are dilatory or lacking merit." Brown, 2000 UT 89 at ¶ 29, 16 P.3d 540 (quotations and citation omitted).
¶ 20 In denying JMS's rule 56(f) motion, the trial court found that JMS had failed to meet its burden. The trial court found that JMS failed to present any affidavit or statement by counsel of "what [was] being sought in the deposition that has not been had, that would lead to a basis for responding to the motion for summary judgment." The court further found that after CAT's motion was filed, JMS's "priorities have not been to try to establish criteria to dispute the motion for summary judgment, but rather to pursue other matters ...." The record amply supports the trial court's findings.
¶ 21 For example, although JMS submitted a voluminous supplemental memorandum opposing summary judgment, it failed to provide the court with specifics of what further discovery was needed, what facts it believed would be uncovered, and how those facts were relevant to the summary judgment issues before the court. In addition, JMS was granted several discovery extensions. CAT stipulated to an extension when JMS claimed it had more depositions to take. CAT also stipulated to four separate extensions of time to permit JMS to file its reply memorandum, causing the partial summary judgment hearing date to be moved from November 20 to December 18. In addition, JMS was granted another extension for discovery with the cut off date finally set for December 29, 2000.
¶ 22 Despite JMS's several discovery extensions, it failed to take any further depositions, from November 14 until December 18, 2000, of individuals it claimed were needed to oppose CAT's motion.[3]
¶ 23 JMS speculated that documents and further depositions would implicate Coats, show that CAT was the alter ego of Taggart and Coats, and demonstrate that an oral agreement existed. However, the record supports the trial court's finding that JMS was not diligent in obtaining the depositions of key witnesses in order to dispute CAT's summary judgment motion, but instead spent this time taking the deposition of a less important individual. Further, JMS did not articulate adequate reasons for its rule 56(f) motion, but appeared to be "on a `fishing expedition' for purely speculative facts after substantial discovery ha[d] been conducted [of Coats and Taggart] without producing any significant evidence[.]" Downtown Athletic Club, 740 P.2d at 278. Sufficient time was provided to JMS to conduct discovery procedures to oppose the summary judgment *953 motion. See id. Given JMS's apparent lack of diligence in pursuing discovery regarding CAT's partial summary judgment motion, the trial court did not abuse its discretion in denying JMS's rule 56(f) motion.

B. "Failure to Fund" Claim
¶ 24 JMS argues that the trial court erred in granting CAT's motion for partial summary judgment regarding whether there was an oral contract among Mehr, Taggart, and Coats obligating CAT to fund all of the Newport projects. "A party is entitled to summary judgment only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Lee v. Barnes, 1999 UT App 126, ¶ 7, 977 P.2d 550; see Utah R. Civ. P. 56(c). JMS contends that Mehr, Taggart, and Coats entered into an oral agreement prior to signing the Operating Agreement. The oral agreement, JMS argues, specified that the parties would pursue and develop five projects, all of which CAT would fund. On appeal, JMS argues that the trial court erred in determining that the Operating Agreement was integrated and unambiguous, thus, defeating its claim of CAT's obligation to fund projects.
¶ 25 First, JMS argues that the Operating Agreement was not intended to be an integration of all the agreements between Mehr, Taggart, and Coats. Relying on the affidavit and deposition of Mehr, JMS contends that the Operating Agreement was created to provide guidance, not to detail the specific projects to be pursued by the parties.
¶ 26 The trial court first addressed whether the contract was integrated. See Webb v. R.O.A. Gen., Inc., 804 P.2d 547, 551 (Utah Ct.App.1991) (stating "trial court must first determine if the contract is integrated"). The relevant portions of the Operating Agreement at issue are paragraphs 3.3, 3.4, and 12.2. These paragraphs state:
3.3 Contributions, Rights and Obligations of Investment Group. The Investment Group shall provide funds to the Company for the purchase of real Property and for approvals, engineering, utilities, improvements, property taxes and other development costs.
3.4 Additional Contributions. The Members may from time to time be required to make additional contributions to the capital of the Company. However, the requirement to make additional capital contributions shall be in accordance with Section 3.3 and shall be approved by the unanimous agreement of All Members. Voluntary contributions of additional capital also may be made by the Members, with the consent of the Executive Manager or a majority of the Members.
Except as indicated above, the Members have not agreed to and are not obligated to make any other contributions to the capital of the Company. No interest shall be paid to the Members on their initial Capital Accounts of the Company or on any subsequent capital contributions made by the Members. . . .
. . . .
12.2 Entire Agreement; Amendments. This Agreement shall constitute the entire contract between the parties, and there are no other or further agreements outstanding not specifically mentioned herein; provided, however, that this Agreement may be amended, altered, supplemented or modified by the written agreement of all the Members, except where a lesser percentage is required under the Agreement.
¶ 27 JMS argued to the trial court that Mehr's affidavit and deposition support that an oral agreement existed among Mehr, Taggart, and Coats prior to signing the Operating Agreement. CAT argued that because the Operating Agreement included an integration clause, the Agreement was integrated and evidence regarding an oral agreement could not be introduced to contradict its terms. In addition, CAT argued that Mehr's affidavit and deposition were inconsistent with each other and therefore, could not support JMS's argument that an oral agreement existed.
¶ 28 We believe that regardless of whether the Operating Agreement was integrated, the oral agreement claimed by JMS to exist is too vague to be enforceable. JMS claims that "Mehr, Taggart, and Coats agreed that they would investigate and evaluate each of *954 the projects identified in the Newport Contract, and then proceed to finance, purchase, develop and then sell for a profit each of those projects that were determined to be economically viable." No information is given on what projects would be acquired, when or on what terms these projects would be acquired, or how and to what extent CAT would fund these projects. In sum, the terms and conditions of this oral agreement were not sufficiently definite to allow it to be enforced. See Brown's Shoe Fit Co. v. Olch, 955 P.2d 357, 363 (Utah Ct.App.1998) ("[F]or an agreement to agree to be specifically enforced, it must include sufficiently definite terms and conditions.").
¶ 29 JMS also argues that paragraphs 3.3 and 3.4 are ambiguous because they are capable of two interpretations, and therefore, extrinsic evidence is needed to determine the parties' intent. JMS contends that paragraph 3.3 can reasonably be read to require funding for the projects which Mehr, Taggart, and Coats had investigated and chose to pursue. JMS argues that any other interpretation renders paragraph 3.3 meaningless. CAT argues that paragraph 3.3 does not mean it was obligated to provide all funds necessary to purchase and develop various projects, but only that CAT would contribute funds for that purpose. CAT contends that it met its obligation when it contributed $350,000 in connection with the Hidden Ridge project, contemporaneously with the execution of the Operating Agreement.
¶ 30 "A contract is ambiguous only if the words ... may be understood to reach two or more possible meanings. However, a part[y's] assertion of a different meaning does not in itself render a contract ambiguous." Sparrow v. Tayco Constr. Co., 846 P.2d 1323, 1327 (Utah Ct.App.1993) (internal quotations and citation omitted). If the contract provisions above are ambiguous, then relevant extrinsic evidence, including parol evidence, can be admitted to determine the parties' intent. See id. However, "[a] court may only consider extrinsic evidence if, after careful consideration, the contract language is ambiguous or uncertain." Lee, 1999 UT App 126 at ¶ 9, 977 P.2d 550 (quotations and citation omitted). Therefore, "when contract terms are complete, clear, and unambiguous... they [can] be interpreted by the judge on a motion for summary judgment." Colonial Leasing Co. v. Larsen Bros. Constr., 731 P.2d 483, 488 (Utah 1986).
¶ 31 We conclude the trial court correctly determined that the language of the Operating Agreement's relevant paragraphs is unambiguous. The language of the Operating Agreement is clear: CAT was not required to provide additional capital for any project unless such funding was done "in accordance with Section 3.3 and ... approved by the unanimous agreement of All Members." This language unambiguously anticipates future capital contributions subject to later decisions and consensus by all the members.
¶ 32 Consequently, the trial court did not err in granting summary judgment against JMS on the failure to fund claim.

III. Waiver of Right to a Jury Trial
¶ 33 JMS argues that the trial court erred in trying its case to the bench, instead of a jury. We review the trial court's finding that JMS waived its right to a jury trial for an abuse of discretion. See Security Title Co. v. Hunt, 9 Utah 2d 67, 337 P.2d 718, 719 (1959) (stating court did not abuse discretion by refusing jury trial). JMS contends that in an unrecorded chamber conference, the trial court told them that the trial would be scheduled as a bench trial, but if JMS had made a jury request, it would change the order. However, when JMS later indicated that a jury trial was requested, the trial judge relied on only his recollection of the event to determine that JMS had waived its right to a jury trial. CAT argues that while JMS originally requested a jury trial, it waived that right during the April 10, 2000 scheduling conference. CAT argues that the trial court's findings regarding waiver were properly based on notices sent by the court to counsel, the minutes of the scheduling conference, an affidavit of CAT's counsel, and JMS's failure to object to these notices.
¶ 34 When JMS filed its complaint, it requested a jury trial. However, on April 18, 2000, the court held an unrecorded pretrial scheduling conference with counsel. The *955 minutes from that conference state that the case was set for a four day bench trial on December 19, 2000. On November 9, 2000, the court held a hearing on JMS's motion to continue the trial, which motion was granted. After this hearing, a copy of the court's minutes and notice of bench trial were sent to JMS. The minutes state that a bench trial was scheduled before Judge Bohling on April 17, 18, 19, and 20, 2001. It was not until March 29, 2001, that JMS filed an amended complaint and demand for jury trial. The trial court denied JMS's demand for a jury, determining that JMS had waived its right to a jury trial.
¶ 35 The trial court based its determination on JMS's failure to object to the "scheduling order prepared by the Court during the conference and served on the parties at the conclusion of the conference," as well as "the minutes of the scheduling conference mailed to the parties immediately after the conference," both of which indicated that the case had been set for a bench trial. In addition, JMS failed to object to the November 9, 2000 notice mailed to it granting JMS's motion to continue trial and setting the case once again for a bench trial on April 17, 2001.
¶ 36 The Utah Code and Rules of Civil Procedure address jury trials in civil cases. Utah Code Ann. § 78-21-1 (2002) states:
In actions for the recovery of specific real or personal property, with or without damages, or for money claimed as due upon contract or as damages for breach of contract, or for injuries, an issue of fact may be tried by a jury, unless a jury trial is waived or a reference is ordered.
(Emphasis added.)
¶ 37 Rule 38 of the Utah Rules of Civil Procedure addresses the right to a jury trial and describes the manner for requesting the same. See Utah R. Civ. P. 38. Rule 39 of the Utah Rules of Civil Procedure states:
(a) By jury. When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the register of actions as a jury action. The trial of all issues so demanded shall be by jury, unless
(1) The parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury
. . . .
Utah R. Civ. P. 39.
¶ 38 A jury trial is an important constitutional right, but like other constitutional rights it can be waived. See Utah Const. art. I, § 10 ("A jury in civil cases shall be waived unless demanded."); International Harvester Credit Corp. v. Pioneer Tractor & Implement, Inc., 626 P.2d 418, 420 (Utah 1981) (stating jury trial may be waived); C.G. Horman Co. v. Lloyd, 28 Utah 2d 112, 499 P.2d 124, 126 (1972) (stating constitutional rights to appeal and to jury trial may be waived). Generally, a party who does not object to a bench trial setting waives the right to a trial by jury. See Security Title Co., 337 P.2d at 719 (holding trial court "did not abuse its discretion in refusing to grant a jury trial which appellant... requested at time of trial" because record showed appellant withdrew jury request during pre-trial and waived right to jury).
¶ 39 Although Utah has not directly addressed waiver of a jury trial under similar circumstances, the issue has been addressed by some federal courts. In Sewell v. Jefferson County Fiscal Court, 863 F.2d 461 (6th Cir.1988), the appellant properly requested a jury trial on the complaint in accordance with rule 38 of the Federal Rules of Civil Procedure.[4]See id. at 463. However, during the final pretrial conference, the appellant requested a continuance of the jury trial date. See id. Appellant's motion was granted, but the court stated in its order that the case was continued until a later date "for a trial before the court." Id. The appellant made no objection to the court's order until the commencement of trial. See id. On the day of trial, the appellant requested the court to summon a jury. See id. The court examined the order, which noted that the trial was to be tried before the court. See id. After a discussion with counsel, the court concluded *956 that the appellant had waived the right to a jury trial by failing to timely object to the court's pre-trial order removing the case from the jury trial docket. See id.
¶ 40 The appellant appealed arguing that her fundamental constitutional right to a trial by jury had been denied. See id. at 464. The appellate court addressed whether the appellant had waived her right to a jury by reviewing rule 39(a) of the Federal Rules of Civil Procedure.[5]See id. The court noted that the "requirements of Rule 39(a) have `been interpreted broadly so as to encompass orders entered by the court and not objected to.'" Id. (citation omitted). Therefore, because the appellant failed to object to the court's written order for a bench trial, the order "constituted a `sufficient entry in the record to satisfy the requirements of Fed.R.Civ.P. 39(a).'" Id. at 465 (citation omitted). The court also stated that the appellant's failure to object to the "order for almost four months provided additional support for the district court's conclusion that there had been a waiver of the jury trial." Id.
¶ 41 Other federal courts have similarly held that a jury trial can be waived under rule 39. See, e.g., United States v. Missouri River Breaks Hunt Club, 641 F.2d 689, 693 (9th Cir.1981) ("The district judge's statement that the parties had agreed to submit the case to the court on the record was sufficient to constitute `an oral stipulation made in open court and entered in the record' as required by Fed.R.Civ.P. 39(a) for a valid waiver of the jury trial right."); Moser v. Texas Trailer Corp., 623 F.2d 1006, 1011 (5th Cir.1980) (stating appellant consented to amended complaint waiving jury trial); Southland Reship, Inc. v. Flegel, 534 F.2d 639, 644 (5th Cir.1976) (holding failure to object for over a month after judge's oral ruling regarding bench trial sufficient to affirm waiver of jury trial); General Bus. Servs., Inc. v. Fletcher, 435 F.2d 863, 864 (4th Cir.1970) (concluding that appellant waived right to jury when appellant failed to object to court's pretrial order that "`stated all parties had waived trial by jury,'" and where there was no record of pretrial conference to dispute that conclusion).
¶ 42 We find the analysis of these federal cases under rule 39 persuasive. Therefore, we hold that the trial court did not abuse its discretion in determining that JMS waived its right to a jury trial because, after having notice that the trial was set before the bench, JMS failed to object until the eve of trial.

IV. Findings of Fact
¶ 43 JMS argues that the evidence at trial undisputedly demonstrated that Taggart and CAT made actionable representations and warranties to JMS and that Taggart and CAT failed to disclose several material facts known to them about the Hidden Ridge project. Thus, JMS contends that the trial court's findings of fact are contrary to the evidence and that the court erred in dismissing JMS's claims for fraud and misrepresentation against Taggart and CAT. JMS's argument consists of the following:
Based upon the trial evidence marshaled by JMS set forth in the foregoing argument,[6] Post-Trial memoranda, Objection and in Addendum 6, all of which are incorporated herein by reference due to page constraints, JMS respectfully asks this Court to conclude that the findings of fact complained of are clearly erroneous.
(Emphasis added.)
¶ 44 When considering arguments on appeal, we look to the requirements of rule 24 of the Utah Rules of Appellate Procedure to determine whether an appellant has adequately briefed the issues. "A party challenging a fact finding must first marshal all record evidence that supports the challenged finding." Utah R.App. P. 24(a)(9). Instead of marshaling the evidence as required under *957 rule 24, JMS simply refers the court to its addenda, arguing that due to the one-hundred page limit it was "forced to rely more heavily than usual on the analysis in their memoranda filed with the [trial] court."
¶ 45 In State v. Jiron, 866 P.2d 1249 (Utah Ct.App.1993), this court held that an appellant's brief violated rule 24(a)(9) when it incorporated by reference a memorandum submitted to the trial court in lieu of an argument. See id. at 1249. This court stated:
We recognize the utility of addenda to briefs for providing the court with materials that are essential to a full understanding of the issues briefed. Addenda typically consist of materials such as the trial court's findings of fact, conclusions of law and judgment; a portion of the trial transcript; the contract which is at issue in the case; a key minute entry, etc. However, it is improper to use an addendum to incorporate argument by reference that should be included in the body of the brief. Allowing this incorporation technique could result in this court's receiving lengthy briefs composed largely of incorporated materials.
Id.; see also Utah R.App. P. 24(f) (stating addendum contents include "statutes, rules, regulations, or portions of the record as required by paragraph (a)").
¶ 46 JMS admits that it did not marshal the evidence within the body of its brief, stating it could not because the one-hundred page limit "forced" it to rely on its addenda to satisfy its marshaling burden. We are not persuaded by JMS's argument. JMS's referral to its addenda is a blatant attempt to skirt the court's grant of an extended one-hundred page limit and is in violation of rule 24(f). Furthermore, JMS has not attempted to meet its burden of demonstrating that despite the marshaled evidence supporting the findings, "the trial court's findings are so lacking in support as to be against the clear weight of the evidence, thus making them clearly erroneous." ELM, Inc. v. M.T. Enter., Inc., 968 P.2d 861, 865 (Utah Ct.App. 1998) (quotations and citations omitted). Because JMS fails to marshal the evidence and properly brief this issue as required under rule 24, we decline to review it.

V. Post Trial Proceedings
¶ 47 First, JMS appears to claim that Harold Rosen should not have been ordered to appear and answer questions about JMS, and other related entities' financial affairs. JMS argues that the trial court erred in requiring Rosen to appear and give testimony on behalf of these entities because rule 69 of the Utah Rules of Civil Procedure does not allow the court to choose the person who will appear on behalf of these entities. Rule 69 of the Utah Rules of Civil Procedure states in relevant part:
At any time when execution may issue on a judgment, the court from which an execution might issue shall, upon written motion of the judgment creditor, with or without notice as the court may determine, issue an order requiring the judgment debtor, or if a corporation, any officer thereof, to appear before the court, a master, or other person appointed by the court, at a specified time and place to answer concerning the judgment debtor's property....
. . . At any time when execution may issue on a judgment, upon proof by affidavit or otherwise to the satisfaction of the court that any person or corporation has property of such judgment debtor or is indebted to the judgment debtor in an amount exceeding two hundred fifty dollars, not exempt from execution, the court may order such person or corporation or any officer or agent thereof, to appear before the court or a master at a specified time and place to answer concerning the same.
Utah R. Civ. P. 69(o)-(p).
¶ 48 After judgment had been entered in favor of CAT, the trial court entered an order in supplemental proceedings requiring Rosen to appear on behalf of JMS to answer questions regarding its assets, liabilities, and financial affairs. Rosen is the president of J.D. West, Inc., which manages JMS Financial. JMS Financial is a member and manager of JMS Meadow and JMS Brook and owner of JMS Hidden. These entities were JMS Financial's only source of significant assets. Rosen is not only a principal, but also performs accounting services for these entities as a certified public accountant. Rosen, *958 as president of J.D. West, Inc., and manager of JMS Financial, was a proper party under rule 69, through whom CAT could examine the assets, liabilities and financial affairs of those entities. Given Rosen's position, the trial court did not abuse its discretion in ordering Rosen to appear and answer questions regarding the financial affairs of these entities.
¶ 49 JMS further argues that the trial court abused its discretion in sanctioning Rosen with a $500 fine. The trial court ordered Rosen to appear and provide CAT with full discovery of JMS Financial, JMS Hidden, and the other related entities' assets available for execution or that otherwise might become the basis for recovery. However, when Rosen appeared pursuant to the court's order, he brought with him only two pages of documents, which consisted of JMS Financial's balance sheet and profit and loss statement. Rosen refused to testify concerning the assets, liabilities, and financials of the other related entities. Rosen was held in contempt and sanctioned to pay CAT's attorney fees of $500. Rosen was then ordered to appear with all relevant financial documents. The record adequately supports the trial court's sanction of Rosen. Therefore, the trial court did not abuse its discretion.
¶ 50 Next, JMS argues that the charging orders entered against its membership interest in Aspenwood and against its membership interest in JMS Meadow and JMS Brook were improper. However, JMS, in opposing a temporary restraining order and preliminary injunction against Aspenwood, used the fact that the trial court had issued charging orders against its interest in Aspenwood to bolster its argument that a temporary restraining order and preliminary injunction were unnecessary because "[c]harging orders [were] already in place"; therefore, CAT would be paid should "any monies come from Aspenwood by way of distribution." Moreover, JMS did not contest these orders before the trial court. For these reasons, JMS waived its right to contest the charging orders on appeal. See Dejavue, Inc. v. U.S. Energy Corp., 1999 UT App 355, ¶ 11, 993 P.2d 222 ("It is well settled that issues not raised before the trial court are waived on appeal.").
¶ 51 Finally, JMS argues that the trial court erred by imposing a preliminary injunction against Aspenwood because it was no longer a party after CAT's summary judgment motion was granted. At the time the preliminary injunction was served, Aspenwood was no longer represented by its trial counsel, but had new counsel. Aspenwood's new counsel did not oppose the preliminary injunction so long as Aspenwood could continue to pay its creditors. With that proviso, Aspenwood voluntarily paid CAT those funds that would have been otherwise payable to JMS Hidden. Therefore, JMS's argument is moot. See Phillips v. Schwendiman, 802 P.2d 108, 110 (Utah Ct.App.1990) ("An appeal is moot when the present controversy between the parties is ended and `the requested judicial relief cannot affect the rights of the litigants.'" (citation omitted)). Nevertheless, under rule 69(q) of the Utah Rules of Civil Procedure, the trial court had discretion to impose a preliminary injunction to prevent Aspenwood from distributing its funds until legitimate debts could be determined. See Utah R. Civ. P. 69(q) (allowing court to prohibit transfer of property belonging to or owed to debtor). Thus, the trial court did not abuse its discretion by imposing a preliminary injunction against Aspenwood.

CONCLUSION
¶ 52 In sum, the trial court did not abuse its discretion in scheduling the order in which depositions were to be taken or in failing to impose sanctions on CAT. Neither did the trial court abuse its discretion in denying JMS's rule 56(f) motion due to its lack of diligence in pursuing matters that would support its opposition to CAT's partial summary judgment motion. Further, we conclude that the trial court correctly determined that the Operating Agreement did not impose an obligation to fund on CAT, and the alleged oral agreement was too vague to be enforceable. In addition, JMS waived its right to a jury trial by failing to object until the eve of trial to the trial court's notices stating that the trial was set before the bench. Because JMS did not properly marshal *959 the evidence within the body of its brief, we decline to review its argument that the trial court's findings of fact were clearly erroneous. Thus, the trial court did not err in granting judgment to Defendants on the claims of fraud. Finally, we find no error in the trial court's orders in the post trial proceedings. Therefore, we affirm.
¶ 53 WE CONCUR: NORMAN H. JACKSON, Presiding Judge, GREGORY K. ORME, Judge.
NOTES
[1] The facts and parties in this action, as well as the court proceedings, are complicated. We attempt to describe them as clearly as possible and limit our description to the issues addressed herein.
[2] JMS took the depositions of Taggart for a day and a half, and Coats for a half day, but claimed these depositions were incomplete. During Coats's deposition JMS questioned him regarding issues pertinent to the summary judgment motion.
[3] JMS did take a short deposition of Jim Richie on December 18, 2002, but Richie's deposition had nothing to do with the issues involved in the summary judgment motion.
[4] Utah Rule of Civil Procedure 38 is virtually identical to its federal counterpart.
[5] Utah Rule of Civil Procedure 39 is virtually identical to its federal counterpart.
[6] It is unclear to this court what is meant by the phrase "trial evidence marshaled by JMS set forth in the foregoing argument." There is no marshaling in part IV of JMS's brief, entitled, in part, "Judge Bohling's Findings of Fact Were in Many Material Respects Unsupported by the Clear and Essentially Undisputed Facts Adduced at Trial." Part IV consists of only one or two pages.