**2019 UT App 63**

## THE UTAH COURT OF APPEALS

BLOOM MASTER INC.,
Appellant,
*v.*
BLOOM MASTER LLC,
Appellee.

Opinion
No. 20170226-CA
Filed April 25, 2019

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 150909022

Darwin Bingham and Alisha M. Giles, Attorneys
for Appellant

Erik A. Olson and Trevor C. Lang, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

POHLMAN, Judge:

¶1　Bloom Master Inc. (Seller) sued Bloom Master LLC (Buyer) for breach of contract and unjust enrichment, claiming that Buyer underpaid on a promissory note. The district court granted summary judgment to Buyer based on a provision of the parties' contract purportedly allowing Buyer to make reduced payments. Seller appeals. We affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND[1]

¶2 Seller manufactured a garden planter product that it sold to garden stores and other consumers. After manufacturing and selling the product for some time, Seller decided to sell the manufacturing molds to Buyer, a local garden seed and supply company.

¶3 In August 2011, Buyer and Seller memorialized their transaction in an asset purchase agreement, by which Buyer purchased the planter molds and other assets for $500,000. At closing, Buyer paid Seller $100,000 in cash and financed the remaining $400,000 with a promissory note (the Note), which was attached to and made part of the purchase agreement. The Note provides that Buyer "shall make eight (8) payments of interest and principal," beginning on August 15, 2012, "and continuing on the 15th day of each August thereafter . . . in accordance with the provision herein."[2] The Note identifies August 15, 2019, as the loan maturity date, on which the entire unpaid principal balance and accrued and unpaid interest are due.

---

1. "When evaluating the propriety of summary judgment on cross-motions for summary judgment, we view the facts and any reasonable inferences to be drawn therefrom in the light most favorable to the losing party." *Flowell Elec. Ass'n v. Rhodes Pump, LLC*, 2015 UT 87, ¶ 8, 361 P.3d 91.

2. The Note does not state how much principal is due each year. Seller contends that the Note requires eight annual principal payments in equal installments of $50,000. It is unclear whether Buyer agrees. Buyer has previously identified $50,000 as a default annual payment amount, but in its summary judgment briefing before the district court it noted as "important" that neither the Note nor the asset purchase agreement expressly requires an annual payment of $50,000.

¶4     Immediately after setting forth the Note's repayment terms, section 3 of the Note provides for a modification of its terms in the event the planter product fails to generate "expected sales numbers" in any given year:

> Inasmuch as this Note is being issued in connection with the Purchase Agreement and repayment is dependent upon the continued success of the [planter product], [Buyer] and [Seller] agree that this Note, the principal amount, rates of interest, maturity date and other terms and conditions will be reviewed on an annual basis by [Buyer] and [Seller] prior to each Payment Date. In the event the [planter product] failed to generate expected sales numbers in any given year, the terms of this Note shall be modified in proportion to the reduced sales numbers.

¶5     The Note does not define the term "expected sales numbers." The only sales numbers referred to in the transaction documents are found in a disclosure schedule attached to the asset purchase agreement as part of Seller's representations and warranties regarding its customers and suppliers. In 2009, Seller's net sales totaled $355,314; in 2010, $283,261; and in 2011, $157,916.[3]

¶6     Beginning in August 2012, and continuing for the next three years, Buyer made payments to Seller under the Note. With each payment, Buyer disclosed to Seller how the payment was calculated. For each year, Buyer treated the 2010 net sales in the disclosure schedule as "baseline sales" and compared its

---

3. The parties executed the purchase agreement in August 2011, and thus the sales identified for 2011 represent only a partial year. If the reported sales are annualized for 2011, they total approximately $236,874 ($157,916 ÷ 8 × 12 = $236,874).

actual net sales for the year to that figure to arrive at a percentage. Buyer then reduced what it referred to as a $50,000 "annual payment" by the same percentage. For example, in 2012, Buyer reported actual net sales of $199,325. This amounted to approximately 70% of Seller's reported net sales figure of $283,261 in 2010.[4] Buyer then multiplied $50,000 by the same percentage to arrive at $35,184—the amount Buyer paid on the Note in 2012. Buyer made similar calculations each year, and each year Seller accepted the payments.

¶7 After four years of accepting Buyer's payments, Seller sent Buyer a written notice of default claiming Buyer had failed to pay the "total amount due each year" and demanding the full balance of the loan.[5] Buyer relied on section 3 of the Note to justify the amounts tendered and to deny Seller's demand. Seller then sued Buyer for breach of contract and unjust enrichment, alleging that Buyer breached the contract by not making "the full amount of the yearly payments due and owing." Both parties moved for summary judgment.

¶8 In its motion, Seller argued that the Note requires Buyer to pay $50,000 annually and that Buyer breached its obligation by tendering less than that amount in 2012, 2013, 2014, and 2015. Seller rejected Buyer's reliance on section 3, arguing that Buyer is not entitled to unilaterally modify the amount due each year because the Note requires all amendments to be in writing and signed by both parties. Seller also alternatively argued that

---

4. The 2012 sales ($199,325) are approximately 70.4% of the 2010 sales ($283,261).

5. The Note allows Seller to declare the entire unpaid principal amount of the Note and all accrued interest "immediately due and payable" if an "[e]vent of [d]efault" occurs, which includes Buyer's failure to timely pay any amount of principal or interest due under the Note.

section 3 is unenforceable because it is "little more than an 'agreement to agree'" on some future modification of the Note. Seller explained that because the term "expected sales numbers" is not defined in the Note and section 3 does not provide a formula for calculating reduced payments, it is impossible to know "what this future modification is to be." Finally, it argued that, based on the Note's severability clause, section 3 should be severed from the Note, leaving Buyer obligated to pay the original amount due on the Note without any opportunity to modify its terms.

¶9     For its part, Buyer argued that section 3 excuses it from making the payment Seller demanded and that the section is not unenforceable or severable. It reasoned that its annual payments were compliant without a written amendment to the Note because modification of the Note's terms is "automatic[]" under section 3 if the planter product fails to generate expected sales numbers, which could be found in the disclosure schedule identifying Seller's historical net sales. Buyer also asserted that the requirement for annual review under section 3 was satisfied because Seller had the opportunity to review Buyer's calculations accompanying its annual payments and Seller did not reject any payment or provide "any alternative method of calculating" Buyer's payments.

¶10    The district court granted Buyer's motion and denied Seller's motion. The court concluded that section 3 is not "an agreement to agree," because it makes plain that "both the obligation to pay the Note and the amount to be paid was dependent upon the success of the" planter product. It also concluded that Buyer did not breach the Note, because section 3 clearly allows for the annual payments to be "reduced in proportion to sales." And while the court noted a "possible ambiguity" in the meaning of the term "expected sales numbers," it looked to the disclosure schedule to determine that

"expected sales numbers" means Seller's net sales in 2010.[6] Based on its interpretation of the Note, the court granted summary judgment to Buyer and dismissed Seller's claims for breach of contract and unjust enrichment. Seller appeals.

## ISSUES AND STANDARD OF REVIEW

¶11   Seller contends that the district court erred in denying its motion for summary judgment and in granting summary judgment in favor of Buyer. Specifically, Seller contends that the court erred in not deeming section 3, upon which Buyer relies to tender payment under the Note, unenforceable and severable from the Note as a matter of law. Summary judgment is appropriate when, viewing the facts and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party, "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a); *see, e.g.*, *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 14, 423 P.3d 1150. "We review a district court's grant [or denial] of summary judgment, as well as the court's interpretation of contracts upon which the summary judgment was based, for

---

6. The district court also referenced the "conduct and action of the parties for years" when interpreting the Note. However, it is unclear to what extent the court relied on this course of conduct to interpret the meaning of the term "expected sales numbers." Although course of conduct could be relevant to discerning the meaning of an ambiguous term, *cf. Hill v. Superior Prop. Mgmt. Services, Inc.*, 2013 UT 60, ¶ 13 n.4, 321 P.3d 1054, such reliance would have been inappropriate given that the court deemed the term unambiguous, *Layton City v. Stevenson*, 2014 UT 37, ¶ 21, 337 P.3d 242 ("Only where the contract is ambiguous will [a court] look to extrinsic evidence to interpret a contract.").

correctness." *Desert Mountain Gold LLC v. Amnor Energy Corp.*, 2017 UT App 218, ¶ 11, 409 P.3d 74 (cleaned up).

ANALYSIS

I. Breach of Contract

¶12    We must decide whether the district court correctly determined that Buyer was entitled to summary judgment and that Seller was not. Seller's argument in support of summary judgment in its favor proceeds in two parts: (A) section 3 is an unenforceable agreement to agree and (B) section 3 should be severed to allow enforcement of the balance of the Note.[7] We agree with Seller that section 3 is an agreement to agree, and the district court accordingly erred in granting summary judgment to Buyer. But we conclude that Seller has not demonstrated that it is entitled to severance as a matter of law, and thus the district

---

7. Seller also contends that section 3 is ambiguous because the Note does not define the term "expected sales numbers." Though Seller appears to treat its ambiguity argument and the agreement-to-agree argument as related, our discussion of section 3's enforceability does not turn on the question of ambiguity. A contractual provision may be ambiguous if it is "unclear" or if it "omits terms," *Beckman v. Cybertary Franchising LLC*, 2018 UT App 47, ¶ 75, 424 P.3d 1016 (cleaned up), but a failure to agree on essential terms is more fundamental. An ambiguous contract or contractual provision may still be enforceable, *see Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994, but an indefinite one is by definition "no[t a] contract at all" and is therefore unenforceable, *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 17, 94 P.3d 179 (cleaned up). We accordingly focus our discussion on whether section 3 is enforceable or a mere agreement to agree.

court did not err in denying Seller's motion for summary judgment.

A.    Agreement to Agree

¶13    To form an enforceable contract, the parties must have a "meeting of the minds . . . on the essential terms of the contract." *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 31, 355 P.3d 1000. "So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a contract." *Id.* (cleaned up). Contractual terms are "sufficiently definite" when they are "capable of being enforced." *ACC Capital Corp. v. Ace West Foam Inc.*, 2018 UT App 36, ¶ 12, 420 P.3d 44 (cleaned up).

¶14    An agreement to agree at some later date is thus unenforceable. *See Brown's Shoe Fit Co. v. Olch*, 955 P.2d 357, 362, 364–65 (Utah Ct. App. 1998); *see also Harmon v. Greenwood*, 596 P.2d 636, 639 (Utah 1979) ("Such 'agreements to agree' are generally unenforceable because they leave open material terms for future consideration, and the courts cannot create these terms for the parties."). Although a contract may still be enforced if "some contract terms" are "missing or left to be agreed upon," the "court must be able to enforce the contract according to the parties' intentions." *I-D Elec. Inc. v. Gillman*, 2017 UT App 144, ¶ 25, 402 P.3d 802 (cleaned up). "[I]f those intentions are impenetrable, or never actually existed, there can be no contract to enforce." *Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 12, 78 P.3d 600.

¶15    This court held in *Brown's Shoe* that the lack of a price in a rental agreement or a "mechanism for determining" the price made the lease agreement "too vague and indefinite for specific enforcement." 955 P.2d at 365. In that case, the parties entered into a commercial lease agreement for an initial three-year term and two three-year option periods. *Id.* at 359–60. The parties agreed that the rent for the initial period and the option periods would be based on both per-square-foot rental rates and a

percentage of the lessee's sales. *Id.* at 360. But the parties "did not specify the percentage rental" or "any mechanism for determining that rental amount" for the option periods. *Id.* at 362. The lease agreement merely stated that the parties "would agree on the gross volume figure from which to base additional rent during each year." *Id.* at 360 (cleaned up). This court held that such an agreement to agree was unenforceable because the amount of percentage rent was "left for future agreement." *Id.* at 362–65.

¶16    The terms governing Buyer's repayment under the Note are similarly left for future agreement. The Note requires that Buyer make an annual payment toward the principal amount, but it does not identify how much Buyer must tender each year or provide a reliable mechanism for determining the amount. Instead, section 3 requires the parties to review "th[e] Note, the principal amount, rates of interest, maturity date and other terms and conditions . . . on an annual basis . . . prior to each Payment Date" and to modify the Note's terms "in proportion to the reduced sales numbers" should the planter product fail to generate expected sales. In other words, while the parties generally agreed that the terms would be modified under certain circumstances, the parties left the specifics to annual review and future agreement. And without a specific agreement, one is left to wonder, among other things, how terms like interest rates and maturity dates are to be modified in proportion to reduced sales numbers, whether the principal amount in its entirety is subject to a proportional modification, or how the amounts due in a given year are to be determined. At bottom, section 3 does not provide the tools or instructions for how to achieve the modification it requires, and it is therefore an unenforceable agreement to agree. *See id.* at 365.

¶17    The district court reached the opposite conclusion, relying on the mandatory "shall" language in section 3. It reasoned that the provision is not an agreement to agree because "it is clear both the obligation to pay the Note and the amount to be paid

was dependent upon the success" of the planter product. Our supreme court, however, has already rejected similar reasoning. For example, in *Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317 (Utah 1976), the parties to a lease agreement provided in their contract that the lessee "*shall* have . . . the option to renew" and that "the rental amount *will* be renegotiated." *Id.* at 1320 (emphases added) (cleaned up). The parties, however, were "unable to agree on the rental rate," and the district court "implied the parties had agreed on a reasonable rental figure." *Id.* at 1321. On appeal, our supreme court held that the "option to renew was too vague and indefinite to be enforceable" and that a court was not in a position to determine a "reasonable rental figure" when the parties had left it open for negotiation. *Id.*; *see also Cottonwood Mall Co. v. Sine*, 767 P.2d 499, 502 (Utah 1988) ("Courts simply are not equipped to make monetary decisions impacted by the fluctuating commercial world and are even less prepared to impose paternalistic agreements on litigants."). Similarly, in *Richard Barton Enterprises, Inc. v. Tsern*, 928 P.2d 368 (Utah 1996), the district court reasoned that a lessor and lessee "agreed to the *concept* of a rent credit" but "did not agree on an amount." *Id.* at 373 (cleaned up). Relying in part on *Pingree*, the supreme court again reversed the district court's imposition of a reasonable amount for proposed modifications and held that agreeing in theory to contractual obligations was insufficient to create an enforceable contract. *Id.* at 373–74.[8]

---

8. This court and others have consistently acknowledged this same principle. In *Aspenwood, LLC v. C.A.T., LLC*, 2003 UT App 28, 73 P.3d 947, this court held that a contractual provision providing that the parties "agreed that they would investigate and evaluate" certain projects and "then proceed to finance, purchase, develop and then sell for a profit each of those projects" was "too vague to be enforceable." *Id.* ¶ 28 (cleaned up). Though the language was clear, there was "[n]o information

(continued…)

¶18　Here, the mandatory language of section 3 signifies that the parties agreed to modify terms in the event sales expectations were not met. But, as demonstrated by *Pingree*, that language does not resolve the question of whether section 3 is sufficiently definite to be enforced. *See* 558 P.2d at 1321; *see also Tsern*, 928 P.2d at 373–74; *Brown's Shoe*, 955 P.2d at 365. While the parties here agreed in principle to modify terms, their failure to agree on the tools to achieve that modification renders the provision indefinite and unenforceable.

¶19　Buyer takes issue with that conclusion, arguing that section 3 is not an agreement to agree, because the annual payment amount can be automatically determined by comparing each year's sales to the 2010 net sales figure and reducing an

---

(…continued)

. . . given on what projects would be acquired, when or on what terms these projects would be acquired, or how and to what extent [the parties] would fund these projects." *Id.* Likewise, in *Savoy Energy, LLC v. Aston Energy, LLC*, No. 2:16-CV-967, 2018 WL 1756930 (D. Utah Apr. 10, 2018), the parties' contract provided that the defendant "shall have first right of refusal to own, construct and operate all future pipelines," but that right was "dependent on the requirement that the parties negotiate a gathering and transportation fee prior to construction of any future pipelines." *Id.* at *7 (cleaned up). Again, despite the mandatory "shall" language, the court concluded that the provision, which left terms to future negotiation, was "an unenforceable agreement to agree." *Id.*; *see also Carr Office Park, LLC v. Charles Schwab & Co.*, 291 F. App'x 178, 182 (10th Cir. 2008) (holding that a contract providing that the parties "*shall*, in good faith, negotiate and finalize a lease document" demonstrated that the contract was merely "a document to be negotiated and agreed to at a future date" and therefore unenforceable).

annual payment of $50,000 in proportion to the reduced sales numbers. But that contention fails on its own terms. Buyer's argument that modification occurs automatically under section 3 is belied by the requirement for an annual review. If modification were truly automatic, there would be no need to review the Note's terms annually. Further, the terms subject to review under section 3 are not easily modified by the simple application of a mathematical equation. Section 3 states without exclusion that the "terms of this Note shall be modified in proportion to the reduced sales numbers," and specifically identifies terms like interest rates, maturity date, and the principal amount as those terms subject to annual review. Thus, even assuming $50,000 represents the annual payment amount, and that the parties' expectations for future sales could be discerned,[9] how the "modified in proportion" language is to be applied to the Note's other terms remains unclear. Section 3 simply does not provide a workable mechanism for the court to apply. *See Brown's Shoe*, 955 P.2d at 365.

¶20    In sum, section 3 is an agreement to agree because it anticipates some future agreement regarding modification of

---

9. Buyer's reliance on the attached disclosure schedule listing the sales for 2010 to ascertain the parties' expectations for future sales is also flawed. Put simply, past sales do not naturally refer to expected sales. This is especially true when, as here, sales were declining year over year. In 2009, sales for the planter product were $355,314. The following year, sales were down nearly 20% (($355,314 − $283,261) ÷ $355,314 = 20.3%) and, annualizing 2011's sales, ($157,916 ÷ 8 × 12 = $236,874, *see supra* note 3) declined another 16% (($283,261 − $236,874) ÷ $283,261 = 16.4%) in the year after that. Buyer chose the sales figure from 2010 to complete its calculations for its reduced payments, but the parties never agreed that 2010's sales figure would continue indefinitely into the future.

myriad contractual terms and because there is no clear mechanism for determining the modification. A court is therefore unable to enforce section 3, and the district court erred in granting summary judgment to Buyer on the basis of that provision. *See id.*

## B. Severability

¶21    "[E]ven if [an] agreement to agree is invalid, it will not necessarily invalidate an entire agreement of which it forms a part . . . ." 1 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 4:29 (4th ed. 2007). In Seller's view, section 3 is "unenforceable as a matter of law," and "the district court should have severed the unenforceable language" pursuant to the Note's severability clause. And if section 3 is severed, Seller asserts that Buyer is in breach of its obligation by not tendering payments of $50,000 each year.

¶22    Under *Sosa v. Paulos*, 924 P.2d 357 (Utah 1996), "contract provisions are severable if the parties intended severance at the time they entered into the contract *and* if the primary purpose of the contract could still be accomplished following severance." *Id.* at 363 (emphasis added). The district court did not reach the severability question, having rejected Seller's argument regarding the provision's unenforceability. Seller argues that we can decide as a matter of law whether section 3 is severable and award it judgment on its breach of contract claim. But Seller has only addressed, both below and on appeal, the first element of severance, that is, whether Buyer and Seller intended severance. *See id.* Seller has never attempted to demonstrate the second element, that is, whether "the primary purpose [of the Note] could still be accomplished" if section 3 is severed. *See id.* Thus, Seller has not shown that it was entitled to severance as a matter of law, and the district court did not err in denying Seller's motion for summary judgment.

## II. Unjust Enrichment

¶23 "Under [Utah] precedent, a claim of unjust enrichment cannot arise where there is an express contract governing the subject matter of a dispute." *United States Fid. & Guar. Co. v. United States Sports Specialty Ass'n*, 2012 UT 3, ¶ 11, 270 P.3d 464 (cleaned up). In moving for summary judgment, Buyer argued that it was entitled to summary judgment on Seller's unjust enrichment claim because "there is a binding, enforceable contract that governs the relationship between the parties." In granting Buyer's summary judgment motion in its entirety, the district court did not separately address the unjust enrichment claim but presumably determined it was superfluous given its conclusion that the parties' express agreement was enforceable. Because the two claims and their disposition by the district court are intertwined, we reverse the court's grant of summary judgment in favor of Buyer on the unjust enrichment claim without opining on its merits.

## CONCLUSION

¶24 We conclude that Buyer was not entitled to summary judgment on Seller's breach of contract claim because section 3, which Buyer relied on to submit payments less than $50,000, is an unenforceable agreement to agree. We also conclude that Seller was not entitled to summary judgment because although section 3 is unenforceable, Seller did not show that section 3 is necessarily severable. And because we reverse the award of summary judgment on the breach of contract claim, we also reverse the dismissal of Seller's unjust enrichment claim. We therefore remand for further proceedings consistent with this opinion.

_____