2003 UT App 112

**John J. HARRIS, M.D., Appellee,**

v.

**IES ASSOCIATES, INC., Appellant.**

**No. 20010563–CA.**

Court of Appeals of Utah.

April 17, 2003.

---

Brian W. Steffensen, Steffensen Law Office, Salt Lake City, for Appellant.

Kristin M. Cappel, Seattle, Washington; and Elizabeth M. Peck, Salt Lake City, for Appellee.

Before Judges JACKSON, BILLINGS, and DAVIS.

## OPINION

DAVIS, Judge.

¶ 1 IES Associates, Inc. (IES) appeals from an amended judgment denying its breach of contract claim, an order dismissing its counterclaim for breach of a modified contract, and postjudgment orders denying its motion to quash subpoenas and overruling objections in postjudgment proceedings.

## BACKGROUND [1]

¶ 2 In late 1995, John Harris (Harris) contacted IES, a Utah corporation, about a home automation system [2] for a home being

---

1. "[W]e view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 250 n. 1 (Utah Ct.App.1997) (quotations and citation omitted). "However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Id.* (quotations and citation omitted).

2. According to the parties' briefs, home automation systems control and allow interface of home subsystems such as heating and air conditioning, lighting, security, intranet, home entertainment, and phone subsystems.

constructed for him in North Carolina. Harris began working with an IES employee, Jeff Nichols (Nichols), on the system design.

¶ 3 On January 25, 1996, Harris and IES entered into a written contract. Under the contract, IES agreed to design, purchase equipment for, install, and program a home automation system including heating and air conditioning, lighting, security, intranet, audio and video, and phone subsystems. In return, Harris agreed to pay $45,805. The contract required all modifications to be written and to be "executed" by both parties. Although Harris supplied a schematic for the home, Nichols created no design documentation. Contrary to Nichols's custom, he did not conduct an on-site inspection before entering into the contract.

¶ 4 When the contract was executed, Harris paid a down payment. Thereafter, he made monthly prepayments. At the end of November 1996, Harris's prepayments totaled $33,850.

¶ 5 On November 16, 1996, Nichols conducted an on-site inspection to prepare for installation of the system under the contract. At trial, Harris testified that upon Nichols's arrival at the site, Nichols represented that the system the contract provided for would not be capable of performing the functions Harris desired and that there was not enough equipment. Harris further testified that he did not request changes or modifications to the system he originally requested.

¶ 6 After about thirty minutes at the site, Harris and Nichols went to Harris's apartment where they spent approximately ten hours designing a home automation system, going room-by-room and subsystem-by-subsystem. Nichols asked questions about what Harris wanted. Using his laptop, Nichols created a document (the proposal) listing equipment by subsystem. Under the proposal, the estimated system cost was $106,600 plus programming costs. Nichols's trial testimony indicated that the proposal

included system control changes and added "more areas" and "more rooms." The proposal also included changes in the quality or quantity of equipment in the subsystems.[3] The proposal was not signed by Harris or Nichols.

¶ 7 Thereafter, Harris sent a letter, dated November 17, 1996, to IES. In relevant part, the letter provides: "I have enclose[d] a list of additions/deletions. Please revise bid reflecting this [and] reflecting discount on [C]restron equip[ment], then send me [an] update bid and we'll be good to go." A list of additions, deletions, and items to "discuss/add" accompanied the letter.[4] There is no record evidence that IES responded as Harris requested in this letter.

¶ 8 On or about November 27, 1996, Harris sent IES a check for $2,500. Harris then sent a letter, dated December 12, 1996, to IES, noting that he had "pour[ed] over the last bid as [they] had expanded the scope of the project." The letter further noted that Nichols "found some discontinued Crestron touch screens and was to make arrangements for acquiring [them]. [Harris] initially agreed, but later found out that they [were] DOS based screens and w[ould] probably not be compatible with future products." Therefore, Harris requested that IES "cancel the order to purchase those discontinued video-touch screens," noted that "they" would "consider the new screens when they are available," and requested "written confirmation that this order [was] cancelled." (Emphasis omitted.) In response, IES faxed a letter indicating that the Crestron touch screen order had been cancelled. The letter further indicated that "[t]here [would] need to be follow up with [Nichols] on the new touch screens."

¶ 9 In a letter dated December 16, 1996, Harris asked IES for an accounting. The accounting IES submitted in reply indicated that almost half of Harris's prepayments had

---

3. Specifically, the proposal substituted video touch screens for grayscale touch screens and provided for a larger control system or larger computer, a different phone system, and additional touch screens, phones, cable, distribution panels, speakers, and volume controls including motorized controls.

4. Harris and Nichols apparently had orally agreed that Nichols would order discounted Crestron touch screens for Harris.

been spent, largely on "wire and fin" and on forty-three hours of labor at $50 per hour, a phone for Harris, and Nichols's airfare.[5] However, IES business records indicated that under $2,500 had been spent on Harris's system.

¶ 10 Towards the end of December, Harris sent IES a letter in which he falsely claimed that he could not afford the system and sought to recover the prepayments he had made with adjustments for reasonable efforts and materials purchased by IES. Harris then sent another letter providing that he was "probably going to have to cancel [the] contract" and proposing a settlement.

¶ 11 After the parties were unable to come to an agreement, Harris filed this action in March 1997. In his complaint, Harris alleged that IES had, inter alia, breached the contract, and he sought recovery of his prepayments. IES counterclaimed alleging, inter alia, breach of contract, that the proposal modified the contract, and breach of the modified contract. IES sought lost profits and compensation for materials purchased and services provided.

¶ 12 Prior to trial, Harris sought to depose, under rule 30(b)(6) of the Utah Rules of Civil Procedure, IES's designated corporate representative. Harris sent three deposition notices indicating that he intended to depose the representative in regard to, inter alia, document authenticity and IES records maintained and/or prepared in the course of its regularly conducted business activities. During the deposition, IES's counsel objected to, inter alia, questions about the representative's status at IES and involvement in production of the documents requested in Harris's First Set of Interrogatories and Request for Production of Documents. IES's counsel maintained the questions were outside the scope of the deposition notices. About thirty minutes into the deposition, IES's counsel made an oral motion for a protective order and instructed the representative not to answer questions about his sta-

tus and involvement in document production. In response, Harris's counsel unsuccessfully attempted to contact the trial court, then ended the deposition. Thereafter, Harris filed a motion to compel the representative's testimony and for sanctions. Following a hearing, the trial court found that the questions asked by Harris's counsel were within the scope of the deposition notices and concluded that although IES's counsel could object on the record, instructing the representative not to answer was improper. The court further found that the conduct of IES's counsel "effectively nullified" the deposition. The trial court therefore imposed sanctions under rule 37(a)(4) of the Utah Rules of Civil Procedure.

¶ 13 A bench trial was held in March and August 2000. Among Harris's trial witnesses was an expert in home automation systems. On cross-examination, Harris's expert testified that the system provided for in the contract would function as Harris's trial testimony indicated he desired. However, the expert's testimony also indicated that he was unaware of what Harris and Nichols had discussed and that the heating and air conditioning system would not work.

¶ 14 At the close of IES's case, Harris moved for a directed verdict on IES's counterclaim. The trial court dismissed, under rule 41 of the Utah Rules of Civil Procedure, IES's counterclaim that Harris breached the contract as modified by the proposal. The trial court concluded that the evidence, in particular the proposal and subsequent correspondence between the parties, did not establish a modification of the original contract. The court found that while the parties planned to put a system together, they had not come to an agreement as to scope or pricing.

¶ 15 On September 27, 2000, the trial court entered a signed memorandum decision denying both parties' breach of contract claims. On June 5, 2001, the court entered an

---

5. The phone was not listed in the initial contract and Harris paid for the airfare separately. After trial, the trial court allowed IES to recover the cost of the phone, but found that IES had failed to present credible evidence that established that the "wire and fin" was purchased for Harris's

system. In addition to denying recovery for the cost of the "wire and fin," the trial court also denied the labor costs. IES does not challenge the trial court's denial of these costs independent of its appeal of the amended judgment and the order denying its counterclaim.

amended judgment ruling that although neither party had pleaded the theory, the parties mutually abandoned the contract on November 16, 1996. The trial court based its ruling on findings that: both parties were of the opinion that the original contract would not be adequate to meet Harris's needs and desires; the contract was not capable of meeting Harris's needs once IES was fully aware of Harris's needs; both parties, through their actions and words, indicated that the contract would have to be expanded to perform as Harris desired and accepted that a new agreement would be necessary and they acted accordingly; IES agreed that it could not install a home automation system as needed or desired by Harris under the original contract; on November 16, 1996, Harris and Nichols spent a substantial number of hours attempting to create a substitute agreement; the parties did not reach a substitute agreement although they engaged in further written and oral communications in regard to a new agreement; Harris acquiesced in IES's abandonment of the contract by agreeing and participating in attempts to reach a new agreement; and when a new agreement could not be reached, Harris sought partial return of his prepayments, with some equitable adjustments.

¶ 16 Having determined that the parties mutually abandoned the contract, the trial court restored the parties to their precontractual status, awarding Harris his prepayments less reasonable expenses and costs—specifically the phone purchased by IES for Harris—incurred by IES up to the point when the parties mutually abandoned the contract on November 16. The trial court awarded Harris prejudgment interest on the net amount from the date of his complaint to the date of amended judgment. IES filed an appeal from the amended judgment.

¶ 17 Following entry of the amended judgment, Harris attempted to obtain information about IES's assets to collect on the judgment. In July 2001, the trial court granted, under rule 69(o) of the Utah Rules of Civil Procedure, Harris's motion for an order re-

quiring IES to appear before the trial court and answer concerning its property. Harris also served subpoenas duces tecum on IES's bank and on a former IES employee who apparently performed bookkeeping services for IES during the period covered by the subpoena. The bank subpoena sought IES's account records from December 31, 1999 to July 19, 2001. The subpoena of IES's former bookkeeper sought financial records for eighteen months prior to service of the subpoena on August 6, 2001.

[1] ■■■ IES filed motions to quash the subpoenas, alleging that Harris could not subpoena its former bookkeeper under rule 69 and that the subpoenas were unduly burdensome.[6] IES also claimed that the subpoenas went beyond the scope of rule 69 and were an attempt to conduct prefiling discovery for a fraudulent conveyance action in violation of rule 27 of the Utah Rules of Civil Procedure.

¶ 19 At a hearing on August 21, 2001, Brent Ivie (Ivie), IES's president, testified that IES stopped "doing business" in August or September 2000. Ivie further testified that IES had no assets. Harris attempted to question Ivie about distributions made to shareholders, what entity was doing business at IES's last address, and its accounts receivable at the time of closing. However, IES objected that the questions were outside the scope of rule 69. The trial court overruled IES's objections and denied IES's motions to quash the subpoenas. However, the court continued proceedings to August 23, 2001 to permit IES to seek an extraordinary writ from the Utah Supreme Court.

¶ 20 On August 22, 2001, IES appealed the trial court's rulings on its objections to the scope of the examination of Ivie and on its motions to quash the subpoenas. IES also filed an Ex Parte Motion for Stay Pending Appeal, which the supreme court denied.

¶ 21 At a second hearing on August 23, 2001, IES's counsel proffered that IES had liquidated its assets to pay debts, had obtained fair market value or better for the

---

**6.** Although IES designates as issues on appeal whether Harris could subpoena its former bookkeeper and whether the subpoenas were unduly burdensome, IES fails to make an argument in the argument section of its brief. Therefore, we do not consider the issues.

assets, and had no assets. IES's counsel objected to any examination beyond IES's assertions as to how the assets were handled and that it had no assets. The court again overruled IES's objections to the scope of examination, noting that under the circumstances it was appropriate to allow Harris to inquire into how the dissolution occurred, if it occurred, where the assets went, and what the compensation was. The court then granted IES's request for a stay of the proceedings pending appeal, subject to an injunction.

¶ 22 In a written order dated August 24, 2001, the court ruled that the subpoenas were a legitimate effort under rule 69 to locate IES's property and assets for collecting the judgment. The order makes no reference to the court's oral ruling on IES's objections to the scope of examination in the postjudgment hearings. The record includes two orders staying proceedings pending appeal of the postjudgment rulings, subject to an injunction.

¶ 23 On December 19, 2001, the Utah Supreme Court transferred IES's August 22, 2001 appeal of the trial court's postjudgment orders to this court. On July 8, 2002, this court consolidated IES's appeals from the amended judgment and the postjudgment orders.

### ISSUES AND STANDARDS OF REVIEW [7]

¶ 24 IES first argues the trial court improperly concluded that rule 30(b)(6) of the Utah Rules of Civil Procedure entitled Harris to ask IES's designated representative questions outside the scope of the deposition notices. However, the trial court found that the questions were not outside the scope of the notices. We will not overturn a trial court's factual findings unless they are clearly erroneous. See Utah R. Civ. P. 52(a).

¶ 25 IES also argues the trial court erred by awarding sanctions to Harris under rule 37(a)(4) of the Utah Rules of Civil Procedure. To the extent this issue requires us to interpret rules of civil procedure, it "presents a question of law which we review for correctness." *Nunley v. Westates Casing Servs., Inc.,* 1999 UT 100, ¶ 42, 989 P.2d 1077. However, "[w]e review a [trial] court's award of [sanctions] under rule 37(a)(4) for an abuse of discretion." *Featherstone v. Schaerrer,* 2001 UT 86, ¶ 31, 34 P.3d 194.

¶ 26 IES next challenges the trial court's determination that the parties abandoned the contract. "Where there is dispute as to whether [abandonment] has occurred, it is usually a question of fact...." *Timpanogos Highlands, Inc. v. Harper,* 544 P.2d 481, 484 (Utah 1975); see 17A Am.Jur.2d *Contracts* § 544 (1991) ("Abandonment of a contract is a mixed question of law and fact; what constitutes an abandonment is a matter of law, and whether there has been an abandonment is a question of fact."). We do not reverse the trial court's finding that the parties abandoned their contract "unless we are persuaded that the evidence clearly preponderates against the finding[ ]." *Timpanogos Highlands, Inc.,* 544 P.2d at 484.

¶ 27 IES also argues the trial court erred by ruling that the parties did not modify the contract. The issue of whether a modification has been proven can be a question of fact. See *Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.,* 1999 UT App 91, ¶ 27, 977 P.2d 541. However, because in this case IES challenges the trial court's interpretation of written documents, the issue presents a question of law. See *Sackler v. Savin,* 897 P.2d 1217, 1220 (Utah 1995) (reviewing trial court decision based solely on written correspondence between parties for correctness); see also *C & Y Corp. v. General Biometrics, Inc.,* 896 P.2d 47, 52 (Utah Ct.App.1995) (reviewing trial court's legal conclusions for correctness where appellants did not challenge the trial court's findings).

¶ 28 IES additionally argues the trial court erred by awarding prejudgment interest to Harris. The propriety of a trial court's decision to award prejudgment interest presents a question of law that we review

---

**7.** IES cites three cases articulating general standards of review for all of the issues presented for appeal. Rule 24 of the Utah Rules of Appellate Procedure requires "for *each* issue: the standard of appellate review with supporting authority." Utah R.App. P. 24(a)(5) (emphasis added).

for correctness. *See, e.g., Lefavi v. Bertoch,* 2000 UT App 5, ¶ 23, 994 P.2d 817.

■ ¶ 29 Finally, IES claims the trial court erred by overruling its objections to the scope of examination of Ivie and by denying its motions to quash the subpoenas. Whether we can review these postjudgment rulings presents a jurisdictional question that we review as a matter of law. *See McCoy v. Utah Disaster Kleenup,* 2003 UT App 49, ¶ 9, 467 Utah Adv. Rep. 23, 65 P.3d 643.

## ANALYSIS

### I. Scope of Rule 30(b)(6) Deposition Inquiries

¶ 30 IES argues the trial court erred by concluding that rule 30(b)(6)[8] of the Utah Rules of Civil Procedure allowed Harris's counsel to ask IES's designated representative questions that exceeded the scope of the deposition notices.[9] However, the trial court did not rule that rule 30(b)(6) allowed Harris's counsel to ask the representative questions that exceeded the scope of the deposition notices. Rather, the trial court found that the questions were within the scope of the deposition notices.

■ ¶ 31 IES does not specifically challenge the trial court's finding. "If a lower court has erred in its written finding[ ] of fact, the proper procedure is for the complaining party to challenge th[at] finding[ ] on appeal under our clearly erroneous standard of review." *MacKay v. Hardy,* 973 P.2d 941, 944 (Utah 1998). To properly challenge a finding, the complaining party must "marshal[ ] the evidence supporting the trial court's finding[ ]" and "then show that th[is] same finding[ ][is] so lacking in support as to be against the clear weight of the evidence, thus making [it] clearly erroneous." *West Valley City v. Majestic Inv. Co.,* 818 P.2d 1311, 1315 (Utah Ct.App.1991) (quotations and citation omitted). IES wholly fails to marshal the evidence supporting the trial court's finding. Specifically, IES fails to discuss the scope of the three deposition notices and to identify or explain why specific deposition questions exceeded the scope of the notices.

■ ¶ 32 Because IES has failed to adequately challenge the trial court's finding that the questions Harris's counsel asked the representative did not exceed the scope of the deposition notices, "we assume[ ] that the record supports the finding[ ]," *Heber City Corp. v. Simpson,* 942 P.2d 307, 312 (Utah 1997) (first alteration in original) (quotations and citations omitted), and conclude the finding was not clearly erroneous. *See MacKay,* 973 P.2d at 944.[10] IES's claim that the trial

---

8. In relevant part, rule 30(b)(6) of the Utah Rules of Civil Procedure provides:

     A party may in the notice and in a subpoena name as the deponent a public or private corporation . . . and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters known or reasonably available to the organization.

9. On appeal IES does not seek specific relief in regard to the trial court's order compelling the representative's testimony. Rather, IES asks this court to reverse the trial court's "ruling that the inquiry in 30(b)(6) depositions is not limited to the scope of the" deposition notices.

10. Moreover, the record shows that the questions IES's counsel objected to were appropriate. IES's counsel objected to questions Harris's counsel asked the representative relating to his employment status with IES, his tenure with IES, and his duties and responsibilities at IES. The deposition transcript indicates that Harris's counsel asked these questions to determine the representative's "credibility and capability of giving information for [the] deposition" as IES's designated representative. Counsel's attempt to make this determination was consistent with one of the purposes of rule 30(b)(6), which is to ensure that a corporation designates an informed and knowledgeable witness to testify on its behalf. *See Starlight Int'l, Inc. v. Herlihy,* 186 F.R.D. 626, 638 (D.Kan.1999) (mem.) (noting that an organization has a duty to designate an informed, adequately prepared witness under the text of rule 30(b)(6) of the Federal Rules of Civil Procedure). Therefore, these foundational questions were appropriate.

  IES's counsel also objected to two questions Harris's counsel asked the representative about his involvement with IES's response to Harris's First Set of Interrogatories and Request for Production of Documents, which largely requested identification and production of IES documents

court improperly allowed questioning that exceeded the scope of the deposition notices necessarily fails.

## II.  Sanctions under Rule 37(a)(4)

¶ 33 IES argues the trial court abused its discretion by imposing sanctions under rule 37(a)(4) of the Utah Rules of Civil Procedure. Under rule 37(a)(4), when a motion for an order compelling discovery is granted, the trial court

> shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

Utah R. Civ. P. 37(a)(4).

¶ 34 In essence, IES asserts that its opposition to the order compelling its designated representative to answer the deposition questions was "substantially justified" because the questions exceeded the scope of the deposition notices.  IES further asserts that it was entitled to instruct the representative not to answer the questions to present a motion under rule 30(d)(3) of the Utah Rules of Civil Procedure.[11]

¶ 35 Rule 30(d)(3) provides that

> [a]t any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in *bad faith or in such manner as unreasonably to annoy, embarrass, or oppress* the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c) [of the Utah Rules of Civil Procedure].... Upon demand of the objecting party or deponent, the taking of the deposition shall be suspended for the time necessary to make a motion for an order.  The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

Utah R. Civ. P. 30(d)(3) (emphasis added).

¶ 36 IES does not effectively argue,[12] nor does the record show, that Harris's counsel conducted the deposition in "bad faith or in such manner as unreasonably to annoy, embarrass, or oppress" IES or its designated representative.  *See id.*  Rather, the trial court found, unchallenged by IES on appeal, that the questions were within the scope of the deposition notices.  In cases such as the present where a protective order is not warranted, rule 30(c) provides that "[a]ll objections made at the time of the examination ... shall be noted by the officer upon the record of the deposition, but the

related to the breach of contract claims.  The first question, which Harris's counsel was unable to complete because she was interrupted by IES's counsel, was, "[D]id you review ... ?"  The second question was about the extent of the representative's involvement in the search for the requested documents.  Although it is difficult to determine from the deposition transcript because of IES's counsel's interruptions, it appears as though Harris's counsel was attempting to ask the representative about his knowledge of or involvement with the responsive documents.  The questions relate to two items listed in the deposition notices: "1. The authenticity of the documents produced by IES" and "2. IES records maintained and/or prepared in the course of its regularly conducted business activities, including without limitation, the documents identified above."  Therefore, these questions were also appropriate.

11.  Rule 30 of the Utah Rules of Civil Procedure was amended effective November 1, 1999, between the deposition and the trial court's ruling on the motion to compel and for sanctions.  Although the amendments rewrote and subdivided rule 30, the text relevant to our analysis was substantially unchanged.  Therefore, we cite the amended rule.  *See* Utah R. Civ. P. 30 (2000).

12.  "[T]his court is not a depository in which the appealing party may dump the burden of argument and research."  *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998) (quotations and citations omitted).  "[R]ule 24(a)(9) [of the Utah Rules of Appellate Procedure] requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority."  *Id.*

examination shall proceed with the testimony being taken subject to the objections." Utah R. Civ. P. 30(c). We therefore conclude the trial court did not err by concluding that IES's counsel improperly instructed the representative not to answer the questions and by determining that IES's opposition to Harris's motion to compel was not "substantially justified." Moreover, the trial court's finding that IES's counsel "effectively nullified" the deposition, is inadequately challenged by IES on appeal. We accordingly conclude the trial court did not abuse its discretion by imposing sanctions under rule 37(a)(4).

### III. Abandonment of the Contract

¶ 37 IES argues the trial court's finding that the parties abandoned the contract is against the clear weight of the evidence.[13] "A contract may be [abandoned] by acts or conduct of the parties inconsistent with the continued existence of the contract." *Parduhn v. Bennett*, 2002 UT 93, ¶ 11, 61 P.3d 982 (quotations, emphasis, and citation omitted); *see* 17A Am.Jur.2d *Contracts* § 543 (1991) ("A contract will be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior."). Where, as here, there is a dispute as to whether an abandonment occurred, "it is ... a question of fact, to be determined from the circumstances of the particular case, which include not only nonperformance, but also expressions of intent and other actions of the parties." *Timpanogos Highlands, Inc. v. Harper*, 544 P.2d 481, 484 (Utah 1975) (footnote omitted); *see Parduhn*, 2002 UT 93 at ¶ 11, 61 P.3d 982 (" '[M]utual assent to abandon ... a contract may be inferred from the attendant circumstances and conduct of the parties.' " (quoting 17A Am.Jur.2d *Contracts* § 558 (1991) (emphasis omitted))).

¶ 38 IES challenges the trial court's findings that it abandoned the contract and that Harris acquiesced in that abandonment. "A party challenging a fact finding must first

marshal all record evidence that supports the challenged finding." Utah R.App. P. 24(a)(9). IES claims that it marshaled the evidence in the addenda to its brief by stating what Harris's "position was in opposition to each of [its] positions."

¶ 39 " '[I]t is improper to use an addendum to incorporate argument by reference that should be included in the body of the brief.' " *Aspenwood, L.L.C. v. C.A.T., L.L.C.*, 2003 UT App 28, ¶ 45, 466 Utah Adv. Rep. 7 (quoting *State v. Jiron*, 866 P.2d 1249, 1249 (Utah Ct.App.1993)). Moreover, IES does not meet its burden to marshal by simply listing evidence for and against its position.

> The marshaling process is not unlike becoming the devil's advocate. Counsel must extricate himself or herself from the client's shoes and fully assume the adversary's position. In order to properly discharge the duty of marshaling the evidence, the challenger must present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists. After constructing this magnificent array of supporting evidence, the challenger must ferret out a fatal flaw in the evidence. The gravity of this flaw must be sufficient to convince the appellate court that the [trial] court's finding resting upon the evidence is clearly erroneous.

*West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct.App.1991) (emphasis omitted).

¶ 40 IES has failed to meet its burden to marshal the evidence in support of the findings and show why, given all of the evidence supporting the findings, the findings are against the clear weight of the evidence. *See id.* IES argues the trial court's finding that IES abandoned the contract is "based upon a single equally faulty finding" that Nichols told Harris that the home automation system under the contract was not capable of performing the functions Harris de-

---

13. To the extent IES claims that the trial court erred by concluding that the parties abandoned the contract although neither party pleaded abandonment, such claim is without merit. *Cf. Fisher v. Fisher*, 907 P.2d 1172, 1176 (Utah Ct.

App.1995) (concluding that issue of oral modification was tried by implied consent under rule 15(b) of the Utah Rules of Civil Procedure where parties clearly focused on oral representations and their likely effect on original agreement).

sired and that more equipment was needed. However, IES ignores that the trial court found that the parties' *actions* and words established that they abandoned the contract.[14] Testimony of Harris and Nichols shows that after the two left the home site, they "started over," spending ten hours designing a system, going through the home room-by-room, system-by-system. The result was the proposal for a system with an estimated cost over twice the contract price.

¶ 41 Further, IES's claim that Harris's testimony was refuted by Nichols's testimony—that the system provided for in the contract would function as Harris desired and that Harris unilaterally wanted to expand the contract—overlooks that it is not the prerogative of this court, but the "prerogative of the trial court as the initial trier of the facts ... to judge the credibility of the witnesses and the evidence presented." *Timpanogos Highlands, Inc.*, 544 P.2d at 483. Moreover, IES fails to marshal Nichols's testimony that supports the trial court's finding that the parties agreed to abandon the contract. *See Pasker, Gould, Ames & Weaver, Inc. v. Morse*, 887 P.2d 872, 877–78 (Utah Ct.App.1994) (noting that party did not meet burden to marshal by calling testimony "self-serving," citing some evidence to the contrary, while ignoring party's own testimony supporting the finding). Nichols testified, "I [do not] think that [Harris] changed the equipment necessarily. I would have been the one who changed the equipment. The equipment would have been as a result of the things we changed, in terms of the interfaces and the control, the levels of control we wanted." Harris's counsel asked, "And who ... wanted the changes that you're just describing?" Nichols replied, "I'm sure it was mutual.... [H]e and I talked and made decisions based on things that he wanted the home to do."

¶ 42 IES also emphasizes that Harris's expert admitted on cross-examination that the initial contract would perform all of the functions Harris's trial testimony indicated he initially requested. However, "expert testimony must be viewed in the context of all of the evidence offered by both parties." *Egbert & Jaynes v. R.C. Tolman Constr. Co.*, 680 P.2d 746, 748 (Utah 1984). IES ignores the expert's testimony that he had no knowledge as to what Harris and Nichols had discussed. Further, IES omits the expert's testimony that the heating and air conditioning system would not work.

¶ 43 IES also challenges the trial court's finding that Harris acquiesced in IES's abandonment. IES notes that Harris sent a check to IES on November 27, 1996, and then sent two letters in December 1996 indicating that he was canceling the agreement, implicitly acknowledging that the parties still had an agreement. However, IES ignores the evidence that shows that Harris had participated in attempts to reach a new agreement and had contacted IES with changes to the proposal.

¶ 44 Because IES has failed to meet its burden to marshal, it has not shown that the trial court's findings are clearly erroneous. *See Majestic Inv. Co.*, 818 P.2d at 1315. Moreover, based on the record, we are not convinced "that the evidence clearly preponderates against the finding[ ]" that the parties abandoned the contract. *Timpanogos Highlands, Inc.*, 544 P.2d at 484. Accordingly, we leave the trial court's finding that the parties abandoned the contract undisturbed.

### IV. Modification of the Contract

¶ 45 IES argues the trial court erred by determining that the parties did not modify the contract. In essence, IES argues the written documents establish that the parties modified the contract. The trial court determined that the evidence, including the docu-

---

14. IES claims that because the contract required modifications to be written and to be executed by the parties, the parties could not abandon the contract orally and by their actions. We disagree. The contract required only modifications to be written. Moreover, it is well settled that "parties to a written agreement may not only enter into separate, subsequent agreements, but they may also [orally] modify [or abandon] a written agreement ... subsequent to entering into the initial written agreement, even if the agreement being modified [or abandoned] unambiguously indicates that any modifications must be in writing." *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 13 n. 4, 40 P.3d 1119.

ments and testimony,[15] did not establish that the parties modified the contract or entered into a substitute agreement.

¶ 46 "[P]arties to a contract may, by mutual consent, modify any or all of a contract." *Pasker, Gould, Ames & Weaver, Inc. v. Morse*, 887 P.2d 872, 877 (Utah Ct. App.1994) (quotations and citation omitted). "A valid modification of a contract ... requires 'a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness.' " *Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996) (quoting *Valcarce v. Bitters*, 12 Utah 2d 61, 362 P.2d 427, 428 (1961)); *see Scott v. Majors*, 1999 UT App 139, ¶ 16, 980 P.2d 214 (noting that to "alter, or supplant a contract fairly made," "[t]he same meeting of the minds is needed that was necessary to make the contract in the first place" (quotations, emphasis, and citation omitted)). "[T]he burden of proof for showing the parties' mutual assent ... is on the party claiming that there [has been a modification]." *Cal Wadsworth Constr. v. St. George City*, 898 P.2d 1372, 1376–77 (Utah 1995) (recognizing price and quantity of construction were material terms in construction contract).

¶ 47 We agree with the trial court that the documents in the present case do not evidence mutual assent. Unlike the signed initial contract that indicates on its face that it is a "proposal and contract" and is accompanied by terms and conditions, the proposal appears to be a list of equipment with price estimates for three subsystems. It is not titled as an addendum or modification. Nor was it signed by either party.[16]

¶ 48 Further, Harris's subsequent letters indicate the proposal was indeed a proposal.

In his November 17, 1996 letter, Harris requested that IES "revise [the] *bid* reflecting" additions and deletions as well as the "discount on [C]restron equip[ment]," and "*then* send [him an] update bid and we'll be good to go." (Emphasis added.) The attached list of additions and deletions also includes items to "discuss/add." In Harris's December 12, 1996 letter, he indicated that he "pour[ed] over the last *bid* " as they had expanded the scope of the project. (Emphasis added.) The letter ends, "please send written confirmation" that the order for the discounted Crestron touch screens was cancelled. (Emphasis omitted.) Harris's letters indicate the parties had not agreed upon any equipment or price modification. Subsequent correspondence from IES indicates only that the discounted touch screen order was cancelled, not that IES agreed to any modification.

¶ 49 We disagree with IES's assertion that the final agreement can easily be determined by reading the contract, proposal, and the parties' letters. The documents alone show that while the parties had planned to put a system together and had discussed scope and pricing, they had not come to an agreement as to the price or scope of any modification or substitute agreement. In addition, "[b]ecause [IES] do[es] not challenge the trial court's factual findings, we must accept [them] as true." *C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 52 (Utah Ct. App.1995). Accordingly, we affirm the trial court's determination that the parties did not modify the contract.

## V. Prejudgment Interest

¶ 50 IES claims the trial court erred by awarding Harris prejudgment interest from the date of Harris's complaint because the

15. IES argues the parol evidence rule barred Harris's testimony that he never agreed to any modifications. IES did not raise this argument below and therefore we need not consider it. *See Oliphant v. Brunetti*, 2002 UT App 375, ¶ 22, 460 Utah Adv. Rep. 35, 64 P.3d 587. Regardless, the rule is inapplicable here. *See Spears v. Warr*, 2002 UT 24, ¶ 19, 44 P.3d 742 (noting parol evidence rule excludes evidence contradicting written integrated agreements).

16. The trial court also determined the parties did not modify the contract because there was no

written modification executed by the parties as required by the contract. We agree with IES that the contract's requirement that modifications be in writing is not determinative. "[P]arties to a written agreement may not only enter into separate, subsequent agreements, but they may also [orally] modify a written agreement ... subsequent to entering into the initial written agreement, even if the agreement being modified unambiguously indicates that any modifications must be in writing." *R.T. Nielson Co.*, 2002 UT 11 at ¶ 13 n. 4, 40 P.3d 1119.

amount due Harris was not "readily ascertainable" at that time.

■ ¶ 51 IES indicates that this claim was preserved by citing pages of the record where its answer and counterclaim are located and the trial transcript volumes without citing pages within those volumes. The answer does not show that this issue was preserved. *See Trench Shoring Servs., Inc. v. Saratoga Springs Dev., L.L.C.*, 2002 UT App 300, ¶ 8 n. 2, 57 P.3d 241 (citing *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998)). Further, IES's general reference to the trial transcript volumes violates rule 24(a)(5)(A) of the Utah Rules of Appellate Procedure. *See id.* Thus, we could decline to consider IES's claim for failure to show that it was preserved. *See Trench Shoring Servs., Inc.*, 2002 UT App 300 at ¶ 8 n. 2, 57 P.3d 241. Additionally, IES fails to cite any relevant controlling Utah authority to support its position and therefore we could decline to consider its claim on that basis. *See State v. Shepherd*, 1999 UT App 305, ¶ 27, 989 P.2d 503.

■ ¶ 52 As framed, IES's claim that Harris is not entitled to prejudgment interest is without merit. "A prejudgment interest award is proper when the damage is complete, the loss can be measured by facts and figures, and the amount of loss is fixed as of a particular time." *Lefavi v. Bertoch*, 2000 UT App 5, ¶ 24, 994 P.2d 817 (quotations and citations omitted). "[A] court may only award prejudgment interest if damages are calculable within a mathematical certainty." *Id.*

■ ¶ 53 IES claims Harris's loss was not "readily ascertainable" when Harris filed his complaint because IES had "good faith claims" that the parties had modified the

contract and that Harris unilaterally canceled the contract, and therefore IES was "entitled to set off, . . . damages arising from the cancellation of the agreement, including but not limited to lost profits." However, Harris's loss—his prepayments—was fixed before Harris filed his complaint. That IES had a potential right to offsetting damages based on its counterclaim for breach of contract, which the trial court found to be without merit, does not preclude an award of prejudgment interest. *Cf. id.* at ¶ 27 (concluding, in "essentially" a breach of contract action, that parties may not avoid paying prejudgment interest because of non-meritorious claim for offsets). Further, Utah appellate courts have recognized that "offsets should be deducted before interest is calculated when an interest bearing award arises at the same time as the offsets." *Richard Barton Enters., Inc. v. Tsern*, 928 P.2d 368, 381 (Utah 1996) (citing *Brown v. Richards*, 840 P.2d 143, 152 (Utah Ct.App.1992)). The trial court offset IES's reasonable costs from the date of Harris's complaint—the undisputed cost of the phone that IES provided Harris—against Harris's prepayments before awarding interest. IES does not specifically argue nor cite any controlling authority for the proposition that an award of prejudgment interest is improper where the trial court makes an offset in returning the parties to the status quo following an abandonment of a contract. Accordingly, that IES had a right to offset the undisputed cost of the phone does not preclude an award of prejudgment interest in this case.

## VI. Scope of Examination and Subpoenas under Rule 69

■ ¶ 54 IES argues the trial court erred by ruling [17] that rule 69 of the Utah Rules of Civil Procedure allowed Harris to subpoena

**17.** IES's August 22, 2001 notice of appeal indicates IES appeals the order denying its motion to quash the subpoenas duces tecum and "rulings" "arising out of [the] hearing held in connection with an Order in Supplemental Proceedings." On August 24, 2001, the trial court entered a written order denying the motion to quash the subpoenas. That IES filed its notice of appeal before the trial court entered its written order denying the motion to quash the subpoenas does not deprive this court of jurisdiction. *See* Utah R.App. P. 4(b)-(c).

The hearing transcript and an unsigned minute entry indicate IES's motion to limit the scope of inquiry of Ivie was denied. Two orders granting IES's motion to stay recognize that the trial court overruled IES's objections to the scope of examination. However, the first order granting IES's motion to stay was voided by the trial court. A signed minute entry ordered Harris's counsel to draft a new order and indicates technical changes were apparently made to the first order. The second order granting IES's motion to stay is unsigned. Because we dismiss for lack

"many years" worth of financial records and to ask Ivie questions about financial transactions and assets covering a period of "several years" prior to the judgment.[18]

¶ 55 We do not reach the merits of IES's argument because we lack jurisdiction under *Independent Funding, Inc. v. Wynn Co., Inc.*, 2002 UT App 153, ¶¶ 1–2, 47 P.3d 932 (per curiam) (concluding postjudgment order compelling attendance of witnesses and production of documents under rule 69 was interlocutory in nature).

¶ 56 This court may raise jurisdiction sua sponte at any time. *See Bainum v. MacKay*, 15 Utah 2d 295, 391 P.2d 436, 436 (1964). "An appeal may be taken from a district ... court to the appellate court with jurisdiction over the appeal from all final orders and judgments." Utah R.App. P. 3(a). "[T]he initial action resulting in a final judgment and the subsequent action seeking enforcement of that judgment are separate proceedings, each resulting in separate judgments that are then individually subject to the rules of appellate procedure...." *Cheves v. Williams*, 1999 UT 86, ¶ 52, 993 P.2d 191 (holding party was required to file separate notice of appeal from execution order). The " 'final judgment [and order] rule does not preclude review of postjudgment [enforcement] orders.' " *Id.* (quoting *Cahoon v. Cahoon*, 641 P.2d 140, 142 (Utah 1982)) (second alteration in original); *see Von Hake v. Thomas*, 759 P.2d 1162, 1167 n. 3 (Utah 1988) (suggesting contempt order arising out of postjudgment proceedings might be appeal-

able). " '[S]uch orders are independently subject to the test of finality, according to their own substance and effect.' " *Cheves*, 1999 UT 86 at ¶ 52, 993 P.2d 191 (quoting *Cahoon*, 641 P.2d at 142). The Utah Supreme Court has recognized that an order is final where "the effect of the order ... was to determine substantial rights ... and to terminate finally the litigation," *Cahoon*, 641 P.2d at 142, or where "it [is] unlikely that any subsequent judgment would be entered from which an appeal could be taken." *Von Hake*, 759 P.2d at 1167 n. 3; *see Bainum*, 391 P.2d at 436 n. 2 (noting order authorizing taking of prefiling depositions under rule 27 of the Utah Rules of Civil Procedure is final " 'because it grants all the relief sought in the petition and disposes of the proceeding' " (quoting *Mosseller v. United States*, 158 F.2d 380 (2d Cir.1946)).

¶ 57 In *Independent Funding*, this court concluded that an order compelling the attendance of witnesses and production of documents at a hearing relating to execution of the judgment was not final for purposes of appeal. *See* 2002 UT App 153 at ¶ 1, 47 P.3d 932. This court noted that the order "addressed preliminary matters related to execution of the judgment.... A final appealable order, in this context, is one that resolves the execution of judgment." *Id.* at ¶ 2.[19] Similarly, in the present case, IES appeals from orders denying motions to quash subpoenas duces tecum and denying objections to the scope of examination in postjudgment supplemental proceedings. Signif-

---

of jurisdiction on other grounds, we do not reach the issue of whether there is a sufficient order overruling IES's objections. *See Kurth v. Wiarda*, 1999 UT App 153, ¶ 8, 981 P.2d 417 (per curiam) (concluding entry of final judgment disposed of post-trial, prejudgment oral motions by necessary implication where the surrounding circumstances indicated the trial court orally considered and rejected the motions).

18. IES misconstrues the scope of the trial court's ruling. The trial court ruled that a judgment creditor need not merely accept a judgment debtor's claim that it has no assets. The court noted that under the circumstances of this case it was appropriate to allow Harris to inquire into how the dissolution of IES occurred, if it occurred, where the assets went, and what the compensation was.

19. Because rule 69(o) does not require the court to issue an execution order, there is a possibility

that a party would be left with choosing between contempt charges or testifying and producing documents without an avenue of appeal outside of a petition for interlocutory appeal. Further, the order denying IES's motions to quash the subpoenas and the overruling of IES's objections to the scope of examination arguably disposed of the motions before the court. However, the law and motion file indicates these arguments were raised and were therefore rejected by the court in *Independent Funding*. Because we find no material distinction between this case and *Independent Funding*, we conclude we lack jurisdiction. *See State v. Menzies*, 889 P.2d 393, 398–99 (Utah 1994) (discussing horizontal stare decisis (citing *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993))). Our conclusion creates uniformity in that parties who seek review of similar orders denying motions to quash subpoenas or compelling document production or testimony under rule 69 will file petitions for interlocutory appeal.

icantly, in this case IES's counsel indicated "that if IES does answer those questions, if we move forward, then I believe that certain issues which we have appealed, would then become moot." We accordingly conclude that neither the order denying IES's motions to quash nor the ruling on its objections is final for purposes of appeal. *See id.*

█ ¶ 58 IES "has not sought permission to appeal an interlocutory order." *Id.* at ¶ 3 (citing Utah R.App. P. 5). "When a matter

is outside the jurisdiction of this court, it retains only the authority to dismiss." *Id.* Accordingly, we dismiss IES's appeal of the postjudgment order denying IES's motion to quash the subpoenas duces tecum and overruling of its objections to the scope of examination in the postjudgment hearings.[20]

## CONCLUSION

¶ 59 We conclude: (1) the trial court's unchallenged finding that the questions

---

20. Moreover, in relevant part, rule 69 provides:

> At any time when execution may issue on a judgment, the court from which an execution might issue shall, upon written motion of the judgment creditor, with or without notice as the court may determine, issue an order requiring the judgment debtor, or if a corporation, any officer thereof, to appear before the court ... at a specified time and place *to answer concerning the judgment debtor's property.* ... The order may also restrain the judgment debtor from disposing of any nonexempt property pending the hearing. Upon the hearing such proceedings may be had for the application of the property of the judgment debtor toward the satisfaction of the judgment as on execution against such property.

Utah R. Civ. P. 69(*o*) (emphasis added). Rule 69 further provides:

> At any time when execution may issue on a judgment, upon proof by affidavit or otherwise to the satisfaction of the court that any person or corporation has property of such judgment debtor or is indebted to the judgment debtor in an amount exceeding two hundred fifty dollars, not exempt from execution, the court may order such person or corporation or any officer or agent thereof, to appear before the court ... at a specified time and place to answer concerning the same.

Utah R. Civ. P. 69(p). Further, "[w]itnesses may be required to appear and testify in any proceedings brought under this rule in the same manner as upon the trial of an issue." Utah R. Civ. P. 69(r).

Although Utah appellate courts have not specifically addressed whether a judgment creditor may inquire into a judgment debtor's assets prior to the entry of judgment, nothing on the face of this rule prohibits a judgment creditor from making reasonable and relevant inquiries beyond a judgment debtor's assertion that it presently has no assets. *Cf. Jensen v. Eames,* 30 Utah 2d 423, 519 P.2d 236, 239 (1974) (noting in dicta that " '[a] judgment creditor may litigate the question of a fraudulent conveyance in a garnishment proceeding, in a creditor's bill in equity, or in an execution proceeding, provided that once contested the burden is upon the one alleging the fraudulent conveyance to prove by clear and convincing evidence that the transfer was in fact fraudulent' " (citations omitted)); *Utah Poultry &*

*Farmers Coop. v. Bonie,* 13 Utah 2d 13, 367 P.2d 860, 860–61 (1962) (noting in dicta that judgment debtor had money on deposit almost a year prior to judgment in upholding an order requiring the debtor to "turn over" money that he withdrew six days after entry of judgment). What is reasonable and relevant depends on the circumstances.

In the present case, trial was held in March and August 2000. Ivie testified that IES stopped "doing business" in August or September 2000. In September 2000, the trial court entered its memorandum decision denying the parties' breach of contract claims. After the amended judgment was entered in June 2001, Harris subpoenaed IES's bank account records from December 31, 1999 to July 19, 2001. The subpoena of IES's former bookkeeper sought financial records for eighteen months prior to service of the subpoena on August 6, 2001. During the postjudgment hearings, Harris sought to examine Ivie about when IES stopped doing business, what its accounts receivable were, and what distributions were made to shareholders, and what entity was doing business at IES's last address. It is reasonable to allow Harris to seek financial records from the time of trial and to examine IES about whether IES stopped doing business, when it did so, what assets it had when it did so, and what happened to its assets.

In construing similar rules, courts in other jurisdictions have allowed examination about "past financial payments which could lead to the discovery of concealed or fraudulently transferred assets." *Securities & Exch. Comm'n v. Tome,* 1987 WL 9415, 1987 U.S. Dist LEXIS 3269, No. 81 Civ. 1836(MP) (S.D.N.Y. April 3, 1987) (citing *Monticello Tobacco Co. v. American Tobacco Co.,* 12 F.R.D. 344, 344–45 (S.D.N.Y.), *aff'd,* 197 F.2d 629 (2d Cir.1952) (noting purpose of rule is "to obtain discovery of assets" and "reach 'equitable' assets beyond the scope of legal execution or to reach property concealed or fraudulently transferred" (quotations and citation omitted))); *Fleming v. Etherington,* 227 Kan. 795, 610 P.2d 592, 595 (1980) (recognizing that judgment creditors are allowed to "find out about assets on which execution can issue or about assets that have been fraudulently transferred or are otherwise beyond the reach of execution ... but third persons can be examined only about the assets of the judgment debtor and

Harris's counsel asked IES's designated representative were within the scope of the deposition notices is fatal to IES's claim that the trial court improperly concluded rule 30(b)(6) allowed questioning outside the scope of the notices; (2) the trial court did not abuse its discretion by awarding sanctions under rule 37(a)(4); (3) the trial court did not err by determining that the parties abandoned and did not modify the contract; and (4) the trial court appropriately awarded prejudgment interest. Accordingly, we affirm the amended judgment and order dismissing IES's counterclaim. We conclude we lack jurisdiction to consider the trial court's postjudgment orders. Therefore, we dismiss the appeal of those orders.[21]

¶ 60 WE CONCUR: NORMAN H. JACKSON, Presiding Judge, and JUDITH M. BILLINGS, Associate Presiding Judge.

cannot be required to disclose their own"); *see also Troy v. Superior Ct.*, 186 Cal.App.3d 1006, 231 Cal.Rptr. 108, 112 (1986) (allowing examination about property transferred in last ten years); 30 Am.Jur.2d *Execution & Enforcement of Judgments* §§ 719–20 (1994) (citing relevant cases).

However, courts have also emphasized that "inquiry must be kept pertinent to the goal of discovering concealed assets of the judgment debtor." *Caisson Corp. v. County W. Bldg. Corp.*, 62 F.R.D. 331, 334 (E.D.Pa.1974); *see Blaw Knox Corp. v. AMR Indus., Inc.*, 130 F.R.D. 400, 402 (E.D.Wis.1990) (noting rule 69 could not be used to inquire about alleged fraudulent transactions where eight years had lapsed since alleged transactions). Relevant inquiries include inquiries into related entities and identification of officers and directors that may have assets of the debtor. *See Aspenwood, L.L.C. v. C.A.T., L.L.C.*, 2003 UT App 28, ¶ 49, 466 Utah Adv. Rep. 7 (upholding an award of sanctions for failure to comply with a rule 69 order to provide full discovery of related entities' "assets available for execution or that otherwise might become the basis for recovery" and for party's failure to testify "concerning the assets, liabilities, and financials" of related entities); *Caisson Corp.*, 62 F.R.D. at 335 (concluding relevant inquiries under similar rule included examining a corporate officer "about the entities with whom the judgment debtor had and has financial relationships"); *see also Troy*, 231 Cal.Rptr. at 112 (concluding relevant inquiry included "names and addresses of ... partners, co-shareholders, co-officers and co-directors, ... which could reveal the existence and location of assets" owned by the judgment debtor).

21. We deny Harris's request for attorney fees under rule 24(j) of the Utah Rules of Appellate Procedure and deny IES's motion to strike Harris's brief.